Noah GREENSPUN, Plaintiff-Appellee,

v.

Eugene F. BOGAN et al., Defendants-Appellees (two cases).

Appeal of Joseph STEIR.

Appeal of MORGAN GUARANTY TRUST COMPANY OF NEW YORK.

Nos. 73-1303, 73-1304.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1974.

Decided Feb. 22, 1974.

Christopher Crowley, New York City, with whom John R. Hally, Daniel C. Sacco, Nutter, McClennen & Fish, Boston, Mass., Davis Polk & Wardwell, New York City, and Hannoch, Weisman, Stern & Besser, Newark, N. J., were on brief, for appellants.

George C. Caner, Jr., Boston, Mass., with whom John Silas Hopkins, III, Robert Charles Clark, Elizabeth Paine and Ropes & Gray, Boston, Mass., were on brief, for Durand A. Holladay and others, appellees.

Gordon T. Walker, Boston, Mass., with whom James D. St. Clair and Hale & Dorr, Boston, Mass., were on brief for Eugene F. Bogan and others, appellees.

Irving Bizar, New York City, with whom Demov, Morris, Levin & Shein, New York City, Harvey A. Silverglate, and Silverglate, Shapiro & Gertner, Boston Mass., were on brief, for Noah Greenspun, appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This consolidated appeal arises from a judgment of August 3, 1973, approving the settlement of a shareholder's derivative suit, commenced April 5, 1972 on behalf of Continental Mortgage Investors (CMI), a real estate investment trust, against its management advisor, Continental Advisors (CA), and against its trustees, some of whom were affiliated with CA. The suit alleged that a corporate opportunity had been diverted from CMI, and also that fees paid to CA by CMI, under its advisory contract, were excessive and unwarranted by the services rendered. Appellant Morgan Guaranty Trust Company (Morgan), holding CMI stock as trustee in various trusts, and appellant Joseph Steir (Steir), a stockholder, neither a party to the original suit, contend that the district court abused its discretion in approving the settlement and in denying Morgan's Rule 60(b) motion to reopen the settlement judgment. They seek to have the entire issue remanded to the district court for the issuance of a new notice of settlement and a new hearing on the fairness of the proposed settlement. We conclude that a remand is unnecessary and improper under the circumstances of this case, and affirm the district court.

Appellants claim that the district court abused its discretion principally because (1) it failed to conduct the independent evaluation of the settlement required under Rule 23.1, F.R.Civ.P.; (2) the settlement itself is grossly unfair; (3) notice to CMI shareholders was inadequate because it failed to disclose material facts relating to the settlement; and (4) since appellant Morgan mislaid notices of settlement through clerical error, the court abused its discretion in refusing to reopen the proceedings.

I

Negotiations concerning a possible settlement spanned several months before it was finally announced that settlement had been reached. On March 19,

1973, the plaintiff in the derivative action filed an amended complaint, expanding its allegations concerning the excessiveness of the advisory fee schedule. On that same day it was announced that a settlement had been reached "in principle". Thereafter, depositions were taken of certain trustees, and documents collected, concerning the alleged excessiveness of the fee schedule. Details of the settlement were finally resolved by June 22, 1973, on which date a stipulation, setting out the terms of the proposed settlement, was executed and filed in court, along with a motion for an order providing CMI shareholders with notice of the proposed settlement and a hearing on the proposal. The notice was approved and mailed to shareholders on July 2, 1973. In it the settlement terms were set forth, a hearing date of August 2 was established, and objectors to the settlement proposal were put on notice that they must file and serve written objections on or before July 26.

By July 30, when no objections to the settlement had been filed by any shareholder, the plaintiff filed a memorandum in support of the settlement, followed on July 31 by a similar memorandum from defendants. During the August 2 hearing, after presentations from counsel, the court asked if anyone else present wished to speak to the settlement. Appellant Steir then identified himself, and argued that the settlement should not be approved because some trustees of CMI were also trustees of CA—this creating an alleged conflict of interest—and because "35 per cent of the profits of [CMI] go to CA; 65 per cent go to the stockholders who have got $115 million invested in the company." Counsel responded to Steir's argument. At the close of the hearings, additional documents and exhibits were filed with the court. The following day, August 3, the court found the stipulation of settlement to be "fair, reasonable, and proper".

It is well established that a court should not merely rubber stamp whatever settlement is proposed by the parties to a shareholder derivative action. A court must, instead, exercise judgment sufficiently independent and objective to safeguard the interests of shareholders not directly involved in the action. *See* Newman v. Stein, 464 F.2d 689 (2d Cir. 1972), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *cf.* West Virginia v. Charles Pfizer Co., 440 F.2d 1079 (2d Cir. 1971), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). "[I]t is essential . . . that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law." Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson, *supra,* 390 U.S. at 424, 88 S.Ct. at 1163. At the very least, the district court must possess sufficient evidentiary facts to show the fairness of the proposed settlement; the burden is placed squarely on the proponents of the settlement to show that it is in the best interests of all those who will be affected by it. Norman v. McKee, 431 F.2d 769 (9th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1970). F.R.Civ.P. 23.1.

Appellants contend that the district court could not have exercised independent judgment because it lacked sufficient evidence to show the fairness of the proposed settlement. They point to the fact that the court had access to only two depositions concerning the proposed fee schedule, both of which were conducted after the March 19 announcement that an agreement had been reached "in principle" between the parties of the derivative action. Moreover, two volumes of exhibits and documents were given to the court on the eve before it approved the settlement, giving rise to the specu-

lation that the court did not have a full opportunity to review their contents. And appellants point, most particularly, to the fact that the court did not have any documents in its possession which could show that the proposed fee schedule was comparable to the fee schedules of other, similar real estate investment trusts and their advisors.

■ While the district court's evaluation of the proposed settlement may not have been as comprehensive or intensive as it could have been, appellants have failed to show that the district court clearly abused its discretion in approving the settlement because it lacked sufficient evidence on which an independent appraisal might be based. *See* West Virginia v. Charles Pfizer Co., *supra,* 440 F.2d at 1085. We think that the district court had ample opportunity to gain familiarity with the subtleties of the proposed settlement. By the time of the August 2 hearing, the court had read the memoranda from the parties to the action, and had had access to numerous documents and exhibits, which had been gathered in various discovery proceedings over the preceding months. The two additional volumes of exhibits given the court shortly before final approval of the settlement were indeed bulky, but the information that was both new and germane to the fairness of the settlement terms constituted a minor proportion. They were well within the digestive capacity of a judge familiar with the proceedings.

As to the comparability of the fee schedule with other fee schedules in the industry, the affiliated trustees alleged in their memorandum that the new fee schedule was indeed comparable, and referred the court to an exhibit listing fourteen other real estate investment trusts and their fee arrangements. Appellants now contend that the exhibit is grossly misleading in that it fails to show that the fee schedule is one of the highest in the industry since only two trusts on the list are similar to CMI in that they have no Blue Sky limitation on their fees and, as to these two trusts, unlike CMI, undisbursed commitments are not included in their fee base. Appellees argue, however, that several of the trusts on the list do have a fee schedule comparable with CMI's, in which the advisor is paid a fee of 1.2 per cent against the base and, while CMI does not have the Blue Sky limitation, it does not receive other kinds of compensation realized by many other advisors, such as incentive compensation or a portion of forfeited commitment fees or capital gains. Moreover, appellees contend that, for a highly leveraged real estate investment trust (i. e., a trust conducting its business with greater reliance on borrowed money than others, which utilize equity capital to a greater degree), a more meaningful measure would compare fees with gross revenues, instead of with net income, and on this measure CMI stands close to the median in the list. It may be that a different judge with additional data would find that the settlement fell on the short side of fairness. The important point, for present purposes, is that, from the data provided it, the district court could have concluded that the fee schedule built into the proposed settlement was not so out of line with other fee schedules in the industry, considering the difference in circumstances between CMI and others, that the proposed settlement was unfair.

■ Finally, it should be noted that between the time that notice of the hearing on the settlement was issued, on July 2, and the hearing itself, on August 2, not a single discordant sound was heard from any shareholder concerning the advisability of the settlement. No shareholder filed an objection by July 26, when objections were due. Many shareholders were large, institutional investors, who could be expected to safeguard their interests with a modicum of diligence. At the hearing itself the only voice raised in opposition was that of appellant Steir, who alleged a conflict of interest and excessive fees, but presented no documents, data, or other evidence to underline his opposition. Under these circumstances we think that the district

court operated within the bounds of its discretion in approving the settlement. The absence of any detailed opposition is a relevant, if not always reliable, factor in assessing the fairness of such a proposal. Altman v. Liberty Equities Co., 54 F.R.D. 620 (S.D.N.Y.1972).

## II

Appellants urge, however, that the terms of the settlement itself are so obviously unfair—resulting in little or no benefit to CMI—that, regardless of the sufficiency of the evidence, the district court should have seen through the "sham" and rejected the proposal. Not to have done so, say the appellants, was a clear abuse of discretion.

They point out that, under the terms of the settlement, a service to CMI which had been performed by CA under the old advisory contract—that of finding borrowers directly—will be shifted to a new entity, the Conco Mortgage Company (Conco), which is owned or controlled, in part, by trustees of CMI affiliated with CA. However, unlike CA, Conco will charge borrowers a percentage "finder's fee" for referring borrowers to CMI, thereby acting as a kind of "middleman", serving CMI by locating borrowers, and serving borrowers by referring them to sources of funds. Appellants allege that this "finder's fee" charged borrowers properly belongs to CMI, not Conco, since Conco is the agent of CMI, and that any "finder's fee" which borrowers are willing to pay Conco will necessarily reduce the interest rate which borrowers are willing to pay for the use of CMI's money. Thus, according to appellants, Conco's profits will come at the expense of CMI. The guaranteed minimum $400,000 reduction per year in the advisory fee payable by CMI to CA under the terms of the settlement is therefore an obvious sham, say the appellants, which will result in no net benefit to CMI at all whenever Conco's profits on CMI match the reduction in fees.[1] Appellant likens the situation to that of a household cook whose employer would not tolerate taking a kickback from a grocer for "finding" a household for the grocer to serve.

The major premise of appellant's claim is that Conco's "finder's fee" ultimately comes out of CMI's pocket. But this is not at all obvious. Appellees argue that, because Conco will provide borrowers with various services, such as assistance in obtaining long-term mortgage commitments necessary to qualify their loans for consideration by CMI, and access to a full range of lenders besides CMI, borrowers will willingly pay an ex-

---

1. According to the reduced fee schedule built into the new Advisory Contract, the annual reduction in the advisory fee payable by CMI to CA would be the larger of two amounts: (1) The first amount would be the amount of net profits earned and received by Conco on brokerage fees paid by borrowers on loans originated by Conco and placed with CMI. CA guarantees that the amount of the reduction under this arrangement will be no less than $400,000 per year for each of the ten fiscal years beginning April 1, 1973. (2) The second and alternative amount, to be applied if it exceeds the first amount, would be an amount equal to $\frac{1}{10}$ of 1% of that portion in excess of $850 million of the sum of the average annual assets of CMI invested in loans and average annual amount of committed but undisbursed investments of CMI in such loans.

Thus, if in year 1, Conco's profits were only $300,000 and CMI's commitments only $950 million, the advisory fee would be reduced by the guaranteed minimum of $400,000. If, however, in year 2, Conco's profits amounted to $500,000, while CMI's commitments stayed at the $950 million level, then the fee would be reduced by $500,000. Then in year 3, if Conco's profits stayed at the $500,000 level, but CMI's commitments soared to $1500 million, the fee would be reduced by $\frac{1}{10}$ of 1% of $650 million ($1500 million minus $850 million) or $650,000.

Appellants allege that because Conco's profits rightfully belong to CMI, the only real benefit to CMI comes in the difference between CMI's profits and the reduction in fees payable to CA. Thus, to take the above example, appellants allege that in year 1, the real benefit to CMI is only $100,000 (much of which would be eliminated by the shift of audit and trustee expenses from CA to CMI, see infra); in year 2, CMI's real benefit would be zero; and in year 3, CMI's real benefit would be $150,000.

tra fee beyond the cost of money. CMI therefore loses none of the gains from the reduction in its fee payable to CA. In fact, say appellees, CMI gains. Not only will Conco be able to put CMI in contact with more potential borrowers than could CA, but CMI will also reap the benefit of Conco's profits, because, according to the terms of the settlement, the advisory fee which CMI pays to CA will be reduced by the amount of Conco's profits on CMI loans, under one aspect of the formula, whenever those profits exceed $400,000 per year.[2] Appellee, in effect, likens Conco to a real estate broker organized by an owner of office buildings to find tenants, who also, to enlarge his offerings, solicits owners of industrial, commercial, and residential properties. Appellee would say that the fees paid by the tenants to the broker, which are not taken out of the rents paid any of the landlords, resemble the finder's fees to be paid Conco.

■ Again, the important point, for our present purposes, is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement. It does not seem to us that the terms of the settlement are so obviously unfair, resulting in a "sham" benefit to CMI, that the district court could not have wisely approved it. Given the fact, in addition, that no evidence was offered the court to support appellants' present assertions, we think that the district court acted well within its authority.

■ The settlement might not be so favorable to CMI as would a final judgment on the merits. But any settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial. *See* United Founders Life Ins. Co. v. Consumer's National Life Ins. Co., 447 F.2d 647 (7th Cir. 1971); Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960). It is only when one side is so obviously correct in its assertions of law and fact that it would be clearly unreasonable to require it to compromise to the extent of the settlement, that to approve the settlement would be an abuse of discretion.

### III

■ The reason that shareholders did not make the foregoing detailed objections before the settlement was approved, according to the appellants, lay in the fact that the notice to shareholders of the terms of the proposed settlement was grossly misleading. They claim that this fact alone should result in a remand. In particular, appellants point out that the Notice of Settlement failed to show the "illusory nature" of the $400,000 per year guaranteed reduction in fees payable to CA, failed to show the cost of expenses to be shifted to CMI, and failed to alert the shareholders to the "fact" that the fee schedule would be immunized from judicial scrutiny for up to ten years.

■ The Notice to Shareholders of CMI, announcing the date of the settlement hearing, first outlined the allegations which prompted the litigation, including the allegation of excessive fees, and the answers to those allegations by the defendant. The Notice then summarized the settlement terms, describing Conco and the loan origination responsibilities which would be shifted from CA to Conco. The Notice then set out the formulae for the reduction of CMI fees

---

2. Appellants argue strenuously that Conco's exclusive role in loan origination and dominant role as CA's major correspondent in indirect financing will inevitably save CA substantial funds which it previously paid its own personnel for such services. We view this argument as depending wholly on the reality, or illusoriness, of the credit guaranteed CMI by CA. So long as CMI's own pocket is unpicked by Conco's operations, the fact that the "saving" comes out of CA's pocket rather than Conco's is irrelevant.

payable to CA, stating specifically that one formula would be based upon "the amount of net profits earned and received by Conco on brokerage fees paid by borrowers on loans originated by Conco and placed with CMI . . . ." and that "CA will guarantee that the amount of the reduction under this arrangement will be no less than $400,000 per year . . . ." The Notice also stated that "Under this new Advisory Contract CMI will assume the obligation of paying its audit fees and expenses and the fees and expenses of its trustees, each of which were formerly borne by CA." The Notice thereby set out all the facts on which appellants now rely for their assertion that the benefits of the settlement to CMI are "illusory". We find nothing misleading about it. Appellees were under no obligation to include arguments for or against the settlement in the Notice. United Founders Life Ins. Co. v. Consumers National Life Ins. Co., *supra*, 447 F.2d at 655. Clearly, there was no obligation to point out the alleged "illusory nature" of the $400,000 reduction in fees. This assumes a fact yet to be convincingly supported.

The Notice did not specify the precise cost of audit and trustee expenses to be shifted to CMI under the new Advisory Contract, but it is doubtful that precise figures were available. Appellees now estimate that such costs will not exceed $100,000 per year, but the costs might fall considerably below that. Perhaps an estimate within the Notice would have been preferable. But we think this deficiency so insignificant that "[it does] not affect the essential purpose of the notice, namely, to fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them . . . ." Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 323 F.Supp. 364, 378 (E.D.Pa.), aff'd, 403 F.2d 30 (3d Cir. 1971).

Finally, appellants' contention that the new fee schedule will be immunized by settlement from judicial scrutiny for up to ten years is unfounded. The proviso to the Stipulation of Settlement merely states that the court's finding that the settlement is "fair, reasonable, and proper" should not bar any shareholder from questioning the legality of the fee schedule in the future, whenever a materially different set of facts should occur. We understand this proviso to stand, simply, for the finality of the settlement, barring subsequent suit until material circumstances change—a necessary result if parties are to be willing to settle, and an implicit feature of all such agreements.

## IV

Appellant Morgan claims that the district court abused its discretion in denying Morgan's motion to reopen judgment on grounds of "excusable neglect". Morgan alleges that it failed to receive notice due to its own clerical error.

Rule 60(b) of the F.R.Civ.P. is a remedial rule which normally receives a liberal construction from courts concerned that cases not be decided in default against parties who are inadvertently absent. Tolson v. Hodge, 411 F. 2d 123, 130 (4th Cir. 1969); Nicholson v. Allied Chemical Corp., 200 F.Supp. 206, 207 (E.D.Pa.1961). But the liberal construction is usually reserved for instances where error is due to failure of attorneys or other agents to act on behalf of their clients, not where the client's own internal procedures are at fault. Supermarkets General Corp. v. Grinnell Corp., 59 F.R.D. 512, 514 (S.D. N.Y.1973). Moreover, in a derivative action such as this, where the party claiming the benefit of the rule is one member of a large class who received notice, an indulgent construction of the rule might unduly protract settlement proceedings. This suggests that 60(b) relief should rarely be given to any member of the class whose failure to appear at a hearing is due to mistake bordering on carelessness, or carelessness itself. 7 Moore's Federal Practice ¶60 22 at 254

Here, Morgan's failure to appear could well be said to fit into this unexcused category. Morgan was apparently informed on May 22 that settlement had been reached, and that a hearing would be held. On July 2, formal Notice was sent to Morgan in its thirteen different nominee names to three different addresses but, due to clerical error, the Notice failed to reach the proper desk. Subsequent mailings to Morgan referred to the settlement, its terms, and the upcoming hearing. On July 16, Morgan was sent, in addition, thirteen sets of proxy material in preparation for the annual meeting, in which there appeared a description of the litigation and another mention of the August 2 hearing. On July 30, Morgan was sent thirteen quarterly reports which also referred to the settlement and hearing date. Under these circumstances, the district court did not abuse its discretion in denying Morgan's 60(b) motion. *See generally* Robinson v. Bantam Books, Inc., 49 F.R.D. 139 (S.D.N.Y.1970).

Affirmed.