In re Anthony F. **PLESCIA, Sr.** and Johanna Plescia, d/b/a Frenchy's Supper Club, Debtors.

United States Bankruptcy Court, W.D. Wisconsin.

**MIDLAND INSURANCE COMPANY, Plaintiff,**

v.

Anthony **PLESCIA, Sr.,** and Johanna Plescia (now deceased) and represented by her Special Administrator, Anthony Plescia, Security Marine Bank of Madison, Randall Bank, First Wisconsin National Bank of Madison, A. Victoria Eherenman, Chapter 7 Trustee, Defendants.

and

John H. Crowther, Inc., Additional Defendant,

and

R.W. **PLUMMER,** Additional Defendant and Third-Party Plaintiff,

v.

**CAPACITY MANAGERS INTERNATIONAL INCORPORATED,** Third-Party Defendant.

Bankruptcy No. MM–79–1372. Adv. No. 81–0370.

United States Bankruptcy Court, E.D. Wisconsin.

Nov. 20, 1985.

Richard J. Callaway, Callaway & Dunn, S.C., Madison, Wis., for debtor.

James C. Herrick, Paul W. Schwartzenbart, Brynelson, Herrick, Gehl & Bucaida, Madison, Wis., for Midland Insurance Co.

Richard E. Schmidt, Fellows, Piper & Schmidt, Milwaukee, Wis., for R.W. Plummer.

William A. Abbott, Bell, Metzner & Gierhart, S.C., Madison, Wis., for Crowther.

Frank A. Ross, Jr., Ross & Chatterton, Madison, Wis., for trustee.

Roy L. Prange, Jr., Ross & Stevens, S.C., Madison, Wis., for First Wisconsin Nat'l Bank of Madison.

David A. Geier, Voss, Nesson, Erbach & Voss, S.C., Madison, Wis., for Randall Bank.

Russell A. Eisenberg, Howard, Peterman, Eisenberg, Solochek & Nashban, S.C., Milwaukee, Wis., for Security Marine Bank.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

### NATURE OF PROCEEDINGS

An interpleader adversary proceeding was commenced by Midland Insurance Company ("Midland") based upon 28 U.S.C. § 1332 and Rule 22 of the Federal Rules of Civil Procedure to determine:

1. Which, if any, of various-named defendants are entitled to insurance proceeds arising out of a total fire loss which occurred on July 13, 1980; and

2. Midland's right, if any, to indemnification or contribution.

The parties have stipulated that the insurance proceeds payable under the policy total $314,132. Midland has joined as defendants all parties claiming any interest in these proceeds and, in the event of a ruling that it must make payment, has also joined those parties against whom it may be entitled to a judgment of indemnification or contribution.[1]

### PARTIES INVOLVED

In order to place this controversy into proper focus, an identification of each of the participants and an understanding of

---

1. Pursuant to 28 U.S.C. § 157(b)(3) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, it was determined by this Court that this is a non-core proceeding. Prior to the commencement of the trial and pursuant to 28 U.S.C. § 157(c)(1) and (2), all parties submitted written consents enabling this Court to hear, determine, and enter any final order or judgment, subject to review under 28 U.S.C. § 158.

their relationships with each other is fundamental:

1. Midland is the plaintiff and is an insurance carrier which provided, in its multi-peril policy, building, contents, and business interruption coverage for the insured with the following limits:

| | |
|---|---|
| Building | $275,000 |
| Contents | 35,000 |
| Loss of Earnings | 46,032 |
| SUBTOTAL | $314,632 |
| Less: Deductible | (500) |
| TOTAL INSURANCE COVERAGE | $314,132 |

2. Anthony F. Plescia and Johanna Plescia, his now deceased wife, ("the Plescias" or "Plescia") were the insured parties who operated a restaurant and bar known as Frenchy's Supper Club ("Frenchy's"). They operated Frenchy's from October of 1967 to the time of the fire and are also the debtors in this case. Frenchy's was located at 7520 Airport Road, Middleton, Wisconsin.

3. Marine Bank Dane County, formerly Security Marine Bank ("Marine Bank"), holds first and second mortgages on the real estate covering Frenchy's. Marine Bank also holds a first mortgage on an adjacent parcel of real estate and a security interest in all of Plescias' restaurant fixtures, equipment and machinery. It claims an unpaid balance due of $442,575.32 which includes interest at 12% per annum up to May 9, 1985 (which is the date of commencement of this trial).

4. First Wisconsin National Bank of Madison holds a purchase money security interest in certain bar/beverage dispensing equipment of Frenchy's with an approximate balance due of $7,000.[2]

5. Randall Bank holds a third mortgage which is subordinate to the prior mortgages of the Marine Bank on the real estate

covering Frenchy's with a balance due of approximately $13,000.[3]

6. A. Victoria Eherenman ("Trustee") was appointed Trustee for the Plescias when this Chapter 11 case was converted to a Chapter 7 case. The Trustee has asserted a claim on behalf of the bankruptcy estate to all insurance proceeds which may be due exceeding the total outstanding balances on all valid liens and encumbrances.

7. Robert W. Plummer ("Plummer") is an independent insurance agent who obtained insurance coverage for the Plescias.

8. R.H. Crowther, Inc. ("Crowther") is a wholesale insurance agent dealing exclusively with insurance agents. It was Crowther who was contacted by Plummer to obtain coverage for this particular risk and in turn placed it with Midland. Larry Grant was Crowther's manager at all times pertinent to this case.

9. Capacity Managers International, Inc., ("CMI") is the managing general agent and underwriter for Midland, and it provided excess and other special casualty and property lines to Midland on an exclusive basis. John Wagenhoffer was CMI's senior underwriter at all times pertinent to this case. Midland and CMI are separate corporations and are both owned by Ashford Holding Company. At times, the Court will be referring to Midland and CMI jointly as "Midland/CMI".

## FACTUAL BACKGROUND

In December, 1970, the Plescias needed financing and obtained a loan from Marine Bank for $194,500. This loan was secured by a first mortgage on the real estate and also by a chattel security agreement covering the personal property, both of which were owned by the Plescias and were used for the operation of Frenchy's. In June,

---

**2.** First Wisconsin National Bank of Madison had informed this Court and all parties to this action that it had reached an agreement with Marine Bank which provides that in the event the Court finds there is coverage and awards payment to Marine Bank, it would receive a payment from the insurance proceeds paid to

Marine Bank. Under these circumstances, First Wisconsin National Bank of Madison did not participate in this trial.

**3.** Because Randall Bank did not participate in the trial, the extent of its interest, if any, in the insurance proceeds was never established.

1977, the Plescias obtained a second loan for $21,000 which was secured by a second mortgage on the same real estate, a second chattel security agreement on the same personal property and a first mortgage on an adjacent parcel of real estate which was also owned by the Plescias.

Before Midland insured this risk, the Plescias carried property insurance for Frenchy's with The Insurance Company of the State of Pennsylvania, brokered through Wisconsin Special Facilities and covering the period June 15, 1979 through June 15, 1980. In May, 1980, a representative of Wisconsin Special Facilities contacted Phillip J. Rindy, a Vice President of Marine Bank, and inquired if Marine Bank as mortgagee and a named insured wanted this coverage renewed. Rindy, in turn, contacted Plummer because Plummer was the general agent for this account. Plummer, believing that Wisconsin Special Facilities was attempting to deal directly with Marine Bank and thereby avoid paying any commission to him, sought to place the insurance coverage elsewhere. Plummer contacted Crowther, who then arranged for this coverage to be placed with Midland. The Plescias had previously filed for relief under Chapter 11 of the Bankruptcy Code on November 9, 1979. It is undisputed that when coverage was placed with Midland, Plummer knew of the filing of the Chapter 11 case and that Midland and CMI did not have such knowledge. There is a sharp dispute, however, as to whether Crowther was so informed of this by Plummer. Plummer maintains he notified Grant on behalf of Crowther. Grant adamantly denies any such notification.

On June 13, 1980, before Midland or CMI received any written application for insurance from the Plescias, an oral binder for the new insurance coverage for Frenchy's was approved by Samuel R. Salvo, Vice President for CMI. It covered a period from June 15, 1980 through July 15, 1980. The coverage was confirmed by a telex sent by Crowther to CMI and also by a temporary written binder issued by Crowther and sent to Plummer. Subsequently, a written insurance application was completed by Mr. Plescia, with the assistance of Plummer, and then forwarded to Crowther who in turn transmitted it to CMI on June 16, 1980. Page two of this insurance application, which is critical in this case, was not transmitted to CMI at this time. The missing page two contained questions dealing with "a history of bankruptcy" and "all outstanding judgements(sic) or current legal actions" for the proposed insured. The missing page was never noticed by anyone until after the fire. When CMI received the insurance application, the previously issued oral binder and temporary written binder were replaced by CMI's written confirmation of insurance dated June 23, 1980. At that same time— June 23, 1980—CMI, in accordance with its customary business practice, ordered a Dun & Bradstreet financial report and a physical inspection. The Dun & Bradstreet report was completed July 4, 1980 and thereafter mailed to CMI. It contained financial information including the existence of the Plescias' Chapter 11 filing as well as various outstanding liens and encumbrances. Despite CMI's practice of date-stamping its incoming mail, for some unexplained reason, the Dun & Bradstreet report did not bear any date stamp. As a result, precisely when the report was received by CMI has never been established.

The fire occurred on July 13, 1980. Two days later, July 15, 1980, Midland mailed a notice of cancellation of insurance to Plescia. Despite the cancellation notice, a completed insurance policy dated July 31, 1980 was mailed to Crowther.

Meanwhile, shortly after the fire, on July 21, 1980, Wagenhoffer of CMI, having learned of the missing page two of the insurance application, requested that it be completed. Mr. Plescia complied and returned the completed page to Wagenhoffer on July 23, 1980. On February 2, 1981, Atty. James Herrick, acting on behalf of Midland and CMI, notified the Plescias that the insurance policy was void due to alleged "misrepresentation or fraud in the application" and, more specifically, "for the reason that there was misrepresentation on

the application of the facts as to the encumbrances." Atty. Herrick also stated in his February 2, 1981 letter that Midland may be liable to a mortgagee or mortgagees of record and that it would "commence an action to determine the rights of the various parties." This suit was filed in the United States Bankruptcy Court for the Western District of Wisconsin on February 4, 1981 and later transferred to this Court.

## ISSUES

1. Is the insurance policy void under Wis.Stats. 631.11?

2. If the policy is not void, what is the amount of damages Midland must pay?

3. Is there any basis for a finding of bad faith on the part of Midland, and if so, what amount of damages shall be awarded?

4. Is Midland entitled to indemnification or contribution from any of the parties, and if so, from whom?

5. How shall the damages be distributed?

## IS THE INSURANCE POLICY VOID?

Midland seeks a declaration that the insurance policy is void from its inception because of purported misrepresentations, fraud, and concealment in the insurance application by the Plescias and also by Plummer and Crowther, thereby relieving Midland of making any payment to Plescia. Midland also claims that Plummer and Crowther were acting on behalf of Marine Bank and because of this agency relationship, Midland is also not obligated to make any payment to Marine Bank. In support of this position, Midland points to the following information omitted from the application:

1. Plescias' involvement as debtors in a pending Chapter 11 case; and

2. The existence of outstanding encumbrances in addition to those held by Marine Bank.

Midland maintains that these omissions were material and, if known at the time the application was submitted, would have resulted in its rejection of this insurance risk. Wis.Stats. § 631.11(2) is cited as authority for voiding the insurance policy and states:

"631.11. *Representations, warranties, and conditions.*

. . . . .

(2) EFFECT OF MISREPRESENTATION OR BREACH OF AFFIRMATIVE WARRANTY. No misrepresentation or breach of an affirmative warranty affects the insurer's obligations under the policy unless the insurer relies on it and it is either material or is made with intent to deceive or unless the fact misrepresented or falsely warranted contributes to the loss."

Midland states it relied on the application as being true and correct when in fact this was not the case, and that these omissions were either material or done with an intent to deceive Midland, thereby allowing it to declare this policy void.

Upon a close scrutiny of the entire record, including the evidence at the trial, the briefs and the pleadings and after weighing the testimony, this Court has concluded that there is no basis for declaring this insurance policy void. The evidence falls far short of establishing any misrepresentation, concealment, or fraud by anyone in this case. What does appear is a record replete with carelessness, most especially on the part of Midland's own managing agent, CMI. CMI failed to meet its responsibility in detecting the missing page two of the application and in promptly reviewing the Dun & Bradstreet report, both of which would have alerted it to the Plescias' financial condition. It must therefore completely accept all consequences resulting from its failure to act. The fact that the report never came to Wagenhoffer's attention until after the fire only reflects its own breakdown in internal office procedures. Courts have generally refused to grant relief from the consequences of a breakdown in a litigant's own internal procedures. *In re Biddy*, 7 B.R. 50 (Bankruptcy N.D. Georgia 1980); *Baez v. S.S. Kresge Com-*

*pany,* 518 F.2d 349 (5th Cir.1975); *Greenspun v. Bogan,* 492 F.2d 375 (1st Cir.1974); *In re Saltzmann,* 25 B.R. 125 (Bankruptcy E.D.Wis.1982). CMI acknowledged its lack of established office procedures for distributing and delivering its mail. Under these circumstances, parties other than CMI and Midland are not responsible for any consequences which may have resulted.

Moreover, there is nothing in this record to establish that any information was intentionally omitted from the insurance application. This court has had an opportunity to observe Mr. Plescia's courtroom demeanor as a witness. It believes he was an honest and credible witness who did not act with the intent to conceal this information. The fact that Mr. Plescia used the words "first mortgage" on a page of the insurance application which had originally been submitted in and of itself is an indication that there was no intent to hide any subsequent mortgages or other encumbrances. The word "first" implies that there were in existence other encumbrances, even if they were not revealed on the application as originally submitted. This should have been at least a "red flag" to Wagenhoffer or to anyone else responsible for reviewing the application.

There is also nothing in the record to suggest that there was any basis for concern on the part of the Plescias that this coverage would not have been either renewed with Plescia's prior insurance carrier, The Insurance Company of the State of Pennsylvania, or covered by other insurance carriers. The decision to seek alternative coverage was not prompted by any threat of nonrenewal. It was made out of concern by insurance agent Plummer that he would not be paid his commission if the policy had been renewed.

 There are many circumstances in this case which support the conclusion that the omitted information appearing on page two and dealing with the Chapter 11 filing and with the existence of other encumbrances would never have really made any difference in the ultimate decision by Midland/CMI to insure this risk. These include the following events:

1. Midland/CMI's failure to promptly examine and then act upon the Dun & Bradstreet report before the fire occurred. Even though the date that this report was received is not clear, it is reasonable to presume that it had to have been received before the July 13, 1980 fire.

2. Midland/CMI's failure to take any action to declare the insurance policy void until February 2, 1981, approximately 6½ months after the fire and long after Midland/CMI knew of the information contained in the Dun & Bradstreet report or in the missing page two of the application.

3. The lack of any specific inquiry by Wagenhoffer or by anyone else from CMI as to the Plescias' having been involved in a Chapter 11 proceeding or other bankruptcy proceedings or as to the existence of any liens or encumbrances. If this information was as crucial as is now being asserted, it is reasonable to conclude that a more thorough examination would have been conducted before the risk was accepted instead of the cursory conversation which occurred.

4. Midland's/CMI's actions in issuing the insurance policy on July 31, 1980, eighteen (18) days after the fire took place and twenty-seven (27) days after the Dun & Bradstreet report was completed.

5. Midland's/CMI's failure to attach the insurance application to the insurance policy itself. This failure has the effect of subjecting Midland to the consequences of Wis.Stats. § 631.11(1)(a) which states:

 "631.11 *Representations, warranties and conditions.* (1) Entire Contract. (a) *Signed application for policy.* No statement, representation or warranty made by any person in the negotiation for an insurance contract affects the insurer's obligations under the policy unless it is stated in the policy, or in a written application signed by such per-

son, a copy of which is made a part of the policy by attachment or endorsement."

This Court interprets this provision as meaning that an insurer cannot rely upon an application to prove misrepresentation or concealment unless (1) the application was attached to the policy or (2) it was specifically stated within the policy itself that there was no Chapter 11 case and no encumbrances other than that of Marine Bank. In this case, because neither of these requirements was met, Midland's obligations under its policy remained unaffected.

6. Midland/CMI's action in returning only the unearned premium to Plescia, instead of the full premium. This is indicative of a cancellation. When a contract of insurance is declared void *ab initio* by an insurer, the entire insurance premium is returnable. *Couch on Insurance* 2d (Rev.Ed.) § 34.14; *Appleman, Insurance Law and Practice,* § 8365.

7. The lack of any requirement in the underwriting standards used by Midland/CMI that a pending Chapter 11 case would disqualify the proposed insured from coverage. Moreover, the underwriting standards were only guidelines. George Whitford, an experienced insurance consultant, testified at the trial that when this coverage was bound, the insurance climate was "chaotic." Premiums at that time were being actively sought by insurance companies for investment purposes and underwriting guidelines were commonly ignored because of the high prime rates of interest at that time.

8. Midland's method of handling another comparable insurance risk—The Rafters Restaurant—where it cancelled the policy instead of declaring it void. In that case, the insurance application was even more incomplete than the application submitted by the Plescias. The Rafters Restaurant application lacked the signature of the pro-

posed insured and also lacked any financial information. Nevertheless, the policy issued to them was thereafter cancelled instead of being declared void from its inception.

9. Atty. Herrick's February 2, 1981 letter to the Plescias which did not assert the Chapter 11 filing as a reason for declaring the policy void.

For Midland/CMI to maintain, long after the fire took place, that it would not have accepted coverage had it known of the Chapter 11 case and of the other encumbrances is purely speculation and hindsight. These assertions must be viewed in the context of what transpired—namely, a fire which resulted in a total loss. Had the omitted information involved anything which may have contributed to the fire, this might have presented a different situation. However, the fact that the Plescias were debtors in a Chapter 11 proceeding with several outstanding encumbrances not previously revealed had no causal relationship to the fire. Midland's attempt to emphasize these omissions has a hollow ring and must be rejected. The insurance policy is, therefore, not declared void.

## DAMAGES

■ Because the parties have stipulated that the insurance proceeds payable under the policy total $314,132, this amount shall be ordered paid as part of the damages. In addition, interest shall be added to this sum because the proceeds were and continue to be retained and used by Midland. Some parties in this case have urged the Court to apply an interest rate comparable to the average market rate which existed throughout the entire time period that these proceeds were and continue to be used. Midland, on the other hand, asserts that it should not be required to pay any interest for the approximately two years time which passed before the summary judgment motion was decided. It also claims that to the extent that it may be required to pay any interest, the interest rate should be limited to the statutory prejudgment rate of 5% provided under Wis.

Stats. § 138.04. The summary judgment motion which was eventually denied took a substantial period of time before being decided and the delay was not due to any fault on the part of Midland. Nevertheless, Midland had the use of the insurance proceeds during 'this time, and still has retained those funds. It could have tendered payment to the Court, but chose not to do so. Instead, it invested and obtained the benefit of the prevailing prime rate, which for a period of time was soaring, at one time reaching a high of 21.5%.

Wis.Stats. § 628.46 is a provision which specifically deals with the prompt payment of insurance claims and is effective at all times germane to this case. It states:

"628.46 Timely payment of claims. (1) Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss. If such written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after written notice is furnished to the insurer. Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any claim is overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the U.S. mail in a properly addressed, postpaid envelope, or, if not so posted, on the date of delivery. *All overdue payments shall bear simple interest at the rate of 12% per year."* (emphasis added)

This Court adopts the twelve percent (12%) simple interest rate provided by Wis.Stats. § 628.46 as being directly applicable, rather than the 5% pre-judgment rate suggested by Midland. Midland has failed to produce reasonable proof to establish it was not responsible for payment, and under these circumstances, the payment was overdue. The interest on the overdue insurance proceeds of $314,132 commenced as of November 6, 1980, thirty-one (31) days after the proof of loss was received by Midland. This results in total accrued interest of $185,793.52 [4]. Interest shall continue to accrue from and after the date of this decision until the total sum as ordered by this Court has been paid.

## BAD FAITH CLAIM

This Court has considered *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978), which is the leading decision in Wisconsin on the issue of bad faith. *Anderson* and its progeny provide the following two-prong test for proving bad faith:

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."

The first element under *Anderson* for bad faith—absence of a reasonable basis for denying benefits of the policy—was found to exist in the preceding portion of this decision on the subject of the appropriate rate of damages to be applied as part of the damages. What remains unclear, however, from the record is whether the second element—knowledge or reckless disregard of the lack of a reasonable basis for denying the claim—also is present. To perfunctorily reject the bad faith claim on the basis of the record as it presently stands would be inequitable. On the other hand, it would be just as inequitable to find bad

4. This total sum of interest is calculated by multiplying the per diem of $103.276 times 1,779 days (November 6, 1980 through November 20, 1985).

faith and then arbitrarily assess damages. The parties in this proceeding simply have not focused on this aspect of the case. Additional testimony is required to enable this Court to properly address this issue.

## MIDLAND'S RIGHT TO INDEMNIFICATION OR CONTRIBUTION

The parties against whom Midland seeks indemnification or contribution are Plummer and Crowther. This Court is satisfied that neither Plummer nor Crowther knew of the existence of any liens or encumbrances other than that of Marine Bank, and further, that it was not the responsibility of either to affirmatively conduct an investigation into this subject.

The only omission by Plummer and/or Crowther was a failure to disclose to Midland the existence of the Chapter 11 filing. Regardless of who, as between Plummer and Crowther, was responsible for this failure to disclose this fact, it is a matter of little or no significance in the ultimate decision by Midland/CMI to bind this risk. As previously noted, Atty. Herrick's February 2, 1981 letter did not specify that the filing of Chapter 11 as a factor in Midland's decision to declare the insurance policy void. It was Midland's own agent, CMI, who was totally responsible for reaching the decision to cover this risk. It was CMI who ignored its own underwriting guidelines, failed to promptly consider and then take action upon the Dun & Bradstreet report, failed to detect the missing page two from the insurance application and failed to be more thorough in its initial investigation before the insurance risk was bound. It was CMI, not Plummer or Crowther, who was charged with the responsibility of evaluating the information contained within the insurance application. It was CMI, not Crowther or Plummer, who was responsible for investigating into the existence or non-existence of other liens or encumbrances and failed to do so.

Since the conduct of neither Crowther nor Plummer had any causal connection with Midland's decision to bind this risk, there is no basis for indemnification or contribution in favor of Midland against either party.

## DISTRIBUTION OF DAMAGES

Because the bad faith issue has yet to be decided, this Court cannot fully determine the distribution of damages at this time. It can, however, and does authorize a partial distribution to Marine Bank in the sum of $442,575.32 from the damages which have already been found to be due. This amount due to Marine Bank includes interest at the rate of 12% per annum up to the date of the commencement of this trial and was established at the trial. The balance of the proceeds ordered to be paid shall be turned over to the bankruptcy trustee and shall continue to be held pending further proceedings.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.