JANE DOE 30'S MOTHER, Individually, and as Parent, Guardian, and Next Friend of Jane Doe 30, a Minor Child, Individually, and on behalf of all others similarly situated, Plaintiffs,

v.

Earl B. BRADLEY, M.D.; Bay Bees Pediatrics, P.A., a Delaware Corporation; Beebe Medical Center, Inc., a Delaware Corporation; Medical Society of Delaware, a Delaware Corporation; James P. Marvel, Jr., M.D.; Carol A. Tavani, M.D.; Lowell F. Scott, Jr., M.D.; Lowell F. Scott, M.D., P.A.; John J. Ludwicki, M.D.; The Pediatric and Adolescent Center in Lewes, Chartered; and Nicholas Berg, M.D., Defendants.

C.A. Nos. N10C–05–023 JRS, N10C–10–317 JRS.

Superior Court of Delaware, New Castle County.

Submitted: Nov. 13, 2012.
Decided: Nov. 19, 2012.

Ben T. Castle, Esquire and Bruce L. Hudson, Esquire, Hudson & Castle Law, LLC, Wilmington, Delaware; Craig A. Karsnitz, Esquire, Richard A. DiLiberto, Jr., Esquire and Neilli M. Walsh, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington and Georgetown, Delaware; Bartholomew J. Dalton, Esquire, Dalton & Associates, P.A., Wilmington, Delaware; Chase T. Brockstedt, Esquire, Bifferato Gentilotti LLC, Lewes, Delaware; Philip C. Federico, Esquire, Schochor, Federico

& Staton, P.A., Baltimore, Maryland; Alexander J. Palamarchuk, Esquire, Alan L. Frank Law Associates, P.C., Jenkintown, Pennsylvania. Attorneys for Class Plaintiffs.

Bradley J. Goewert, Esquire and Lorenza Wolhar, Esquire, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware; Alexander J. Pires, Esquire, Dewey Beach, Delaware; and Michael M. Mustokoff, Esquire and Lauren DeBruicker, Esquire, Duane Morris LLP, Philadelphia, Pennsylvania. Attorneys for Defendant, Beebe Medical Center, Inc.

Collins J. Seitz, Jr., Esquire, Seitz Ross Aronstam & Moritz, LLP, Wilmington, Delaware; Matthew F. Boyer, Esquire and Josiah R. Wolcott, Esquire, Connolly Gallagher, Wilmington, Delaware; John D. Balaguer, Esquire and Christine Kane, Esquire, White & Williams, LLP, Wilmington, Delaware. Attorneys for Defendants, Medical Society of Delaware, James P. Marvel, Jr., M.D., and Carol A. Tavani, M.D.

Jeffrey M. Austin, Esquire and Colleen D. Shields, Esquire, Elzufon Austin Tarlov & Mondell, P.A., Wilmington, Delaware. Attorneys for Defendants, Lowell F. Scott, Jr., M.D. and Lowell F. Scott, M.D., P.A.

James E. Drnec, Esquire and Melony Anderson, Esquire, Balick & Balick, LLC, Wilmington, Delaware; Natalie C. Magdeburger, Esquire and Chantelle M. Custodio, Esquire, Hodes, Pessin & Katz, P.A., Towson, Maryland; Michael C. Rosendorf, Esquire, Law Office of Michael C. Rosendorf, Stanton, Delaware; M. Natalie Sherry, Esquire, Kramon & Graham, P.A., Baltimore, Maryland. Attorneys for Defendants, John L. Ludwicki, M.D. and the Pediatric and Adolescent Center in Lewes, Chartered.

Michael W. Arrington, Esquire, Parkowski Guerke & Swayze, P.A., Wilmington, Delaware. Attorney for Defendant, Nicholas Berg, M.D.

SLIGHTS, J.

### I.

A duly licensed physician and serial child predator established a medical practice in Lewes, Delaware in 1994 and thereafter perpetrated unimaginable abuse on a significant segment of his pediatric patient population. This reign of abuse continued until his arrest on December 16, 2009. After a thorough investigation by law enforcement, and a skilled prosecution by the Department of Justice, the physician, Earl B. Bradley, M.D., was convicted of multiple criminal offenses, including rape and sexual exploitation of children, and sentenced to fourteen consecutive life terms of incarceration plus an additional one hundred and sixty four years. The Supreme Court of Delaware affirmed the convictions and sentences on September 6, 2012.

Dr. Bradley has no assets. His medical malpractice insurance provides no coverage for the damages caused by his physical and sexual abuse of his patients. There is, therefore, no prospect that Dr. Bradley will ever provide any monetary compensation to his many victims, much less adequate compensation.

Since January, 2010, approximately forty (40) separate lawsuits have been filed against Dr. Bradley and his medical practice alleging, *inter alia*, intentional assault and battery. These complaints also asserted claims against additional defendants, including Beebe Medical Center, Inc. ("Beebe"), The Medical Society of Delaware ("The Medical Society"), James P. Marvel, Jr., M.D., Carol A. Tavani, M.D., Lowell F. Scott, M.D. and his medical practice, John J. Ludwicki, M.D., The Pediatric and Adolescent Center in Lewes, Chartered, and Nicholas Berg, M.D. (col-

lectively "the individual defendants") (all defendants, collectively, "the Covered Defendants"). The claims against Beebe sounded in negligence and were based on agency and negligent credentialing and supervision. The claims against all of the Covered Defendants alleged failures either to report Dr. Bradley to appropriate regulatory/law enforcement authorities or to take other steps to protect Dr. Bradley's patients from his ongoing physical and sexual abuse.

On May 4, 2010, a proposed class action complaint was filed against Dr. Bradley and the Covered Defendants in a case styled *Jane Doe 30 v. Bradley et al.,* C.A. No. N10C–05–023 JRS ("the Complaint"). After motion practice and briefing, the Court certified this class action by bench ruling on March 14, 2011, followed by a written order on April 5, 2011.

The parties have engaged in substantial informal discovery and some formal discovery, including the exchange of thousands of pages of documents and several depositions of health care providers. Several of the Covered Defendants (other than Beebe) have prosecuted motions to dismiss the class action complaint on grounds that the class plaintiffs have failed to state legally viable claims against them. These motions were thoroughly briefed and argued and yielded two lengthy decisions in which the Court raised serious questions regarding the legal *bona fides* of the class plaintiffs' claims against the Medical Society of Delaware and the individual defendants.[1]

Shortly after this litigation commenced, Beebe indicated its desire to initiate settlement discussions with the class plaintiffs. Through counsel, Beebe promptly accepted responsibility for its role (albeit indirect role) in the tragic events leading to the class plaintiffs' claims. Soon after, Beebe and class plaintiffs engaged retired Delaware Supreme Court Justice Joseph T. Walsh to serve as a mediator. The remaining Covered Defendants joined the mediation later in the process and Jed D. Melnick, Esquire, an experienced mediator, was engaged to assist Justice Walsh with respect to the settlement discussions involving these defendants. After more than seventeen (17) months of regular and intensive mediation sessions, Justice Walsh, with Mr. Melnick's assistance, successfully mediated the proposed settlement of the class action which the parties now present to the Court for approval. The proposed settlement, to be described in more detail below, calls for the Covered Defendants collectively to pay $122,150,000.00 in cash to be allocated to class members after the deduction of attorneys fees and expenses. In addition, the proposed settlement calls for designated health care services to be rendered by Beebe and its affiliates to class members with an aggregate value of up to $1,000,000.00.

After carefully considering the parties' written submissions and the evidence presented at the fairness hearing, the Court is satisfied that the settlement is fair, reasonable and adequate. The Court is further satisfied that an award of legal fees in the amount of $27,708,750.00 is appropriate and that class counsel should be reimbursed for past and future costs and expenses in the amount $2,106,248.00.

## II.

### A. The Class Action Complaint

Dr. Bradley worked for Beebe when he first came to Delaware in 1994. He left

---

1. *See Doe 30 v. Bradley,* 2011 WL 290829 (Del.Super.Ct. Jan. 21, 2011); *Doe 30 v. Brad-* *ley,* 2012 WL 1647849 (Del.Super.Ct. May 8, 2012).

the hospital in 2002 to start his own medical practice but retained hospital privileges at Beebe until the time of his arrest. It is alleged that Dr. Bradley abused hundreds of pediatric patients either at Beebe or within his medical practice over the course of the fifteen years he practiced in Delaware. The abuse ranged from inappropriate touching and unnecessarily intrusive physical examinations to rape. Some of the abuse was captured on film by an elaborate video taping system Dr. Bradley installed in his medical office. The victims ranged from infants to prepubescent children.[2] The abuse has been characterized as "unprecedented" in scope and severity, made all the worse by Dr. Bradley's position of trust and the very young age of his victims, some of whom were infants.

Class plaintiffs alleged that Beebe was grossly negligent when it hired, credentialed, supervised and retained Dr. Bradley, first as an employee and then as a member of its medical staff. In this regard, class plaintiffs allege that Beebe would have discovered that Dr. Bradley was engaging in inappropriate behavior towards his patients had Beebe properly investigated certain reports and properly promulgated and implemented safety procedures within the hospital.[3]

In addition to the claims of active negligence against Beebe, it is alleged that Beebe and the other Covered Defendants, at various times and through various means, became aware of information that should have put them on notice that Dr. Bradley was abusing his patients.[4] It is further alleged that this knowledge triggered a legal duty, imposed by statute and also recognized at common law, to report Dr. Bradley's conduct to law enforcement and/or appropriate regulatory authorities.[5] According to the Complaint, the Covered Defendants' failure to fulfill their reporting duty and thereby prevent Dr. Bradley's further abuse proximately caused each member of the class to suffer varying degrees of injury.[6]

Finally, the class plaintiffs allege that certain of the Covered Defendants negligently referred patients to Dr. Bradley even after they knew or should have known that Dr. Bradley was abusing patients. They allege both common law and statutory medical negligence arising from these alleged improper referrals.

All of the Covered Defendants have denied both the factual and legal bases of the class plaintiffs' claims against them, some (the Medical Society and the individual defendants) more vehemently than others (Beebe). As stated, several of the Covered Defendants have prosecuted motions to dismiss the class action complaint and the Court has granted these motions in substantial part and denied them in part, with leave to bring renewed motions to dismiss after amended complaints have been filed. The parties reached this settlement prior to the anticipated next round of dispositive motion practice.

### B. Class Certification

The Court certified this class action by order dated April 5, 2011.[7] While that

---

**2.** *See generally* Second Amended Class Action Complaint, Tr. ID 43972440 (hereinafter "2nd Amend. Comp.").

**3.** *Id.*

**4.** *Id.*

**5.** *Id. See also* 24 *Del. C.* § 1731A; 16 *Del. C.* § 903 (both requiring certain professionals to report suspected child abuse to appropriate authorities).

**6.** *See* 2nd Amend. Comp. ¶¶ 77, 83–84.

**7.** All parties consented to class certification and the Court received no objections from putative members of the class.

order speaks for itself, it is useful briefly to review the bases for class certification here as the procedural posture of the litigation certainly adds context to the Court's consideration of the fairness of the proposed settlement.

The criminal investigation into Dr. Bradley's conduct supervised by the Delaware Department of Justice revealed that Dr. Bradley treated more than seven thousand (7000) patients. At the criminal trial of Dr. Bradley, the State presented evidence that more than 100 of Dr. Bradley's patients had been severely harmed by Dr. Bradley. Plaintiffs' motion for class certification convincingly demonstrated that the harm caused by Dr. Bradley's abuse was likely far more widespread. Yet Dr. Bradley had no assets and likely no insurance to compensate his victims. Consequently, if the victims were to be compensated, such compensation would have to come from a relatively small group of other defendants, most notably Beebe.

## 1. The Limited Fund Mandatory Class Certification

This class was certified pursuant to Rule 23(a) and Rule 23(b)(3).[8] Given the non-opt out nature of the proposed settlement, it is evident that Rule 23(b)(1)(B) is also applicable here.[9] Rule 23(b)(1)(B) provides for class certification when the action satisfies the Rule 23(a) "requisites to class action" and the court is satisfied that "the prosecution of separate actions by . . . individual members of the class would create the risk of [a]djudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."[10] As noted in one of the leading treatises on class action practice, "[t]he potential depletion of acknowledged insufficient assets on a first come, first serve basis is the usual circumstance warranting class action treatment under Rule 23(b)(1)(B)."[11]

During several of Beebe's earliest appearances in this litigation, it was represented to the Court that Beebe likely could not and would not litigate this case. Rather, Beebe advised that if it was required to litigate the claims on an individual basis, its resources to satisfy potential judgments would quickly be depleted leaving subsequent claimants with nothing. Eventually Beebe would be forced to seek protection in the federal bankruptcy court. This was no idle threat. The numbers of potential claims were staggering; the impact of the potential liability on Beebe's ability to secure financing for ongoing operations was

---

8. Trans. ID 36881306. *See* Del.Super. Ct. Civ. R. 23(a) (the Court determined that each of the Rule 23(a) criteria were met: (1) numerosity; (2) common questions of law or fact; (3) typical claims and defenses; and (4) adequate class representation); Del.Super. Ct. Civ. R. 23(b)(3) (the Court also determined that common questions of law and fact predominated over questions affecting only individual members and that a class action would be superior to other means by which to adjudicate the claims).

9. Del.Super. Ct. Civ. R. 23(b)(1)(B).

10. *Id.*

11. 5 *Newberg On Class Actions* § 17:16 (4th Ed.2012). *See also* 32B Am.Jur.2d Federal Courts § 1699 (2012) ("When claims are made by numerous persons against a fund insufficient to satisfy all claims, an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interest of other members who should therefore be represented in the lawsuit, and a class action may be certified under Rule 23(b) to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund.").

obvious; and the likelihood of insurance coverage for Beebe was tenuous at best.

Against this backdrop, the Court was satisfied that class certification was appropriate because: (1) the claims against the Covered Defendants arising from the harm caused by Dr. Bradley were largely based on the same factual and legal predicates; (2) with a potential class of as many as seven thousand (7000) children, the litigation of individual claims, even if aggregated in some form, would have been impractical and burdensome for all concerned; (3) the case involved very young victims, many of whom were too young to testify and all of whom would have been emotionally traumatized by separate litigation and trials; (4) the scope of the damage to many of the victims will be unknown for some time; (5) a class action would eliminate races to the courthouse as individual claimants lay claim to very limited funds; (6) a class action ensures consistent and transparent resolution of *all* claims; (7) a class action provides a means by which limited funds can be distributed to multiple victims (similar to a bankruptcy process);[12] and (8) the class representative, Jane Doe 30, would fairly and adequately protect the interests of the class as her claims were serious, reflective of the most seriously injured members of the class, represented by highly competent counsel and based on the full range of legal theories asserted by other members of the class.[13]

It has been represented to the Court that use of the class action form to address multiple cases alleging sexual abuse is unprecedented. That may well be so. Nevertheless, the Court is satisfied that certification of a limited fund class action was the only way to ensure that all victims could be compensated in this instance given the scope and severity of the sexual abuse alleged here, the common threads that run through the claims, the relatively limited resources of the Covered Defendants, and the real likelihood of a race to the courthouse by individual filers with the

12. The lesson learned from the individually-prosecuted clergy sexual abuse cases filed across the country, many of which resulted in bankruptcy filings by the defendants and prolonged litigation involving multiple creditors, was not lost on the Court. *See e.g., In re Catholic Diocese of Wilmington,* No. 09–13560(CSS); *In re Archdiocese of Milwaukee,* No. 11–20059(SVK); *In re Roman Catholic Archbishop of Portland in Oregon,* No. 04–37154(ELP); *In re Roman Catholic Bishop of San Diego,* No. 07–00939–A1 1. To be clear, Beebe was not and is not insolvent and insolvency was not a factor in the Court's decision to certify this class. Indeed, a defendant's insolvency arguably is an improper basis to certify a limited fund class action. *See In re Joint Eastern & Southern Dist. Asbest. Litig.,* 932 F.2d 7 (2d Cir.1992); *In re Inter–Op Hip Pros. Liab. Litig.,* 204 F.R.D. 330 (N.D.Oh. 2001) (same). Stated differently, the limited fund class action is not intended to serve as a substitute to bankruptcy. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 843, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). In this case, the concern was not that Beebe is insolvent. Rather, the driving force for certification under Rule 23(b) is that "the total of all liquidated claims [against Beebe] and the fund available to pay them, set definitely at their maximums, demonstrate that the fund cannot pay all the claims, resulting in a 'scramble for precedence in payment' and amounts being paid to favored [or first-filed] parties." *Id.* at 838–39, 119 S.Ct. 2295.

13. *See Prezant v. DeAngelis,* 636 A.2d 915, 924–25 (Del.1994) (holding that a judicial determination regarding the adequacy of the class representative was a prerequisite to approval of a class action settlement presented on behalf of a "temporary settlement class"). The Court notes that *Prezant* may have no or less application when the Court is presented with a proposed settlement presented on behalf of a class that was certified well in advance of the proposed settlement. Nevertheless, out of an abundance of caution, the Court reiterates here that this class has been represented by a worthy class representative.

losers finding no money to compensate them at the finish line.[14]

## 2. Notice of The Class Certification

With the much-appreciated assistance of the Department of Justice and a retired Superior Court judge, The Honorable Richard S. Gebelein, who facilitated the notice process, the Court was able to provide direct and widely-published notice of the class action to all of Dr. Bradley's former patients, each of whom constituted the class as certified.[15] Thereafter, the plaintiffs' steering committee received and processed more than nine hundred (900) potential claims from members of the class.

## C. The Proposed Settlement

As stated, the proposed settlement is the product of more than a year of mediation, involving multiple mediation sessions, conducted by a retired Delaware Supreme Court Justice, The Honorable Joseph T. Walsh. Justice Walsh is a highly regarded jurist who served with honor and distinction on Delaware's Superior Court, Court of Chancery and Supreme Court over a judicial career spanning thirty-one (31) years. During this time, he has presided over and/or decided many complex and important cases, and has mediated many

others. While he may disagree, from the Court's perspective, it is hard to imagine that Justice Walsh has faced a more challenging assignment in his professional life than the challenge he faced when the parties asked him to serve as mediator in this case. The Court and the parties owe him a debt of gratitude for doing what many, if not most, thought could not be done.

Justice Walsh was later joined by another experienced mediator, Jed D. Melnick, Esquire, who assisted, in particular, in the mediation of claims asserted against The Medical Society of Delaware and the individual physician defendants. His steadfast commitment to the mediation process, and the results he achieved, are also very much appreciated by the Court.

Both Justice Walsh and Mr. Melnick have endorsed the proposed settlement as fair, adequate and reasonable. These endorsements carry significant weight with the Court.

The proposed settlement is a "non-opt out" or "limited fund" settlement. This means that, if approved, the only way a victim of Dr. Bradley's abuse may seek compensation is to participate in this class action settlement and the claim process it prescribes. If the settlement is approved, the Covered Defendants will receive full

---

14. *Accord Doe I v. Karadzic*, 182 F.R.D. 424, 426 (S.D.N.Y.1998) (limited fund, non-opt out class certified "in order to ensure that the limited funds available to thousands of plaintiffs can be distributed equitably among all the members of the class, should plaintiffs succeed on the merits of their claims, [and to] prevent a situation where one plaintiff lays claim to the lion's share of defendant's limited resources, leaving thousands of others with nothing simply because they lost the race to the courthouse.").

15. The Court takes this opportunity again to express its gratitude to the Department of Justice and Judge Gebelein for their cooperation and hard work to ensure that proper

notice of the class action was received by the class. The Department of Justice maintained records identifying all of Dr. Bradley's patients, with addresses, during the entire span of his medical practice in Delaware. These records were seized directly from Dr. Bradley's medical offices during the criminal investigation. Upon receiving a confidentiality undertaking from Judge Gebelein, the Department of Justice was able to share the patient list with Judge Gebelein so that he, in turn, could direct that notice be sent directly to *all* of the class members while at the same time preserving patient confidentiality. In addition, notice was published in local Sussex County and statewide publications.

and final releases that will extinguish any future claim that any patient or patient's parent may have against them arising from Dr. Bradley's abuse.

The proposed settlement would result in the payment of $122,150,000.00 in cash, less counsel fees and expenses, to eligible members of the class, plus designated health care services to be rendered by Beebe having an aggregate value of up to $1,000,000.00. As discussed below, each of the Covered Defendants has contributed to the proposed settlement although Beebe, by far, is the largest contributor.

## 1. The Beebe Contribution

To reiterate, Beebe has consistently demonstrated its intent to engage the plaintiffs in vigorous settlement discussions in hopes of providing a prompt and fair resolution of the class plaintiffs' claims. Beebe also has consistently maintained that its financial means were limited when measured against the scope of the liability it faced. And, of course, Beebe consistently has advised all concerned that it would likely be forced to seek bankruptcy protection (or perhaps fail altogether) if it was unsuccessful in its effort to secure insurance coverage for the claims against it.

And so began a complex series of negotiations, facilitated by Justice Walsh, between Beebe and its insurers to find coverage to fund a settlement with Dr. Bradley's victims. Without recounting the excruciating details of these discussions, the Court must commend Beebe and its nationally renowned coverage counsel, James R. Murray, Esquire, for their tireless efforts in overcoming the many obstacles to obtaining insurance coverage for the serial intentional abuse

perpetrated by Dr. Bradley while affiliated with Beebe.[16] Suffice it to say, the insurance policies at issue contained several potentially applicable exclusions, including exclusions for sexual abuse, intentionally caused injury and, in some instances, any physical injury. The exclusion hurdles were buttressed by the fact that most of the incidents of abuse occurred during times when the policies with the strongest exclusion language were implicated. Moreover, the insurers were mindful that Beebe had several defenses to the class plaintiffs' claims. Notwithstanding all of these obstacles, Beebe was successful in bringing its insurers to the negotiating table and ultimately brokering an agreement whereby the insurers would fund a very large portion of the proposed settlement in exchange for full releases from future claims arising from Dr. Bradley's abuse of his patients.

According to the terms of the proposed settlement, Beebe would contribute $6,703,458.40 in cash plus an additional $100,000.00 per year over the next five (5) years beginning in 2013. Beebe also has committed to provide medical services to members of the class with an aggregate value of up to $1,000,000.00 through August 10, 2027. These services would include any health care available at Beebe Medical Center or any Beebe-owned facility. The designated treatment fund would be excess to any third-party funding source, such as private or government-funded insurance. In addition to Beebe's out-of-pocket contribution, Beebe's various insurers will contribute a combined total of $111,786,541.69 to the settlement fund.

---

**16.** At the fairness hearing, Mr. Murray testified that this case "far and away" was the most difficult case "in almost every regard" in which he had ever been involved as coverage counsel.

## 2. The Medical Society and Individual Defendants Contributions

The Medical Society and individual defendants have vigorously contested the class plaintiffs' claims, both factually and legally, from the outset of this litigation. As noted above, the Court has expressed its skepticism regarding the legal viability of the claims against these defendants in two published opinions. Not surprisingly and understandably, these defendants were somewhat reluctant to participate in settlement discussions and their insurers were even more reluctant to provide coverage for the losses claimed by those who were intentionally victimized by a physician whom they did not insure. Ultimately, however, again with the assistance of Justice Walsh, Mr. Melnick, and Mr. Murray, the Medical Society of Delaware, through its insurers, agreed to contribute $3,000,000.00 to the settlement fund.

As a result of the mediation, the individual defendants agreed to participate in binding arbitration with the class plaintiffs. This process resulted in a finding in favor of the individual defendants (i.e. a finding of no liability) on all claims. Pursuant to the arbitration agreement, each individual defendant agreed to contribute $50,000.00 towards the settlement notwithstanding the outcome of the arbitration for a total contribution of $150,000.00.

## 3. The Claims Process

The proposed settlement provides for a claims administration process pursuant to which a designated Claims Administrator, Thomas B. Rutter, Esquire, in consultation with pediatrician and child and adolescent psychiatrist, Annie Steinberg, M.D., would receive individual claims from class members and then evaluate and categorize each claim to determine fair, reasonable and equitable compensation based on a Plan of Allocation to be described below. Mr. Rutter is an attorney, admitted to the Bar of Pennsylvania in 1962, and former judge *pro tempore* of the Pennsylvania Court of Common Pleas for the First Judicial District (Philadelphia). He has mediated and arbitrated numerous complex cases including many child sexual abuse cases. He served as a claims administrator in the many cases that arose out of the child sexual abuse by clergy within the Diocese of Wilmington. Dr. Steinberg has clinical faculty appointments in the Department of Psychiatry at The University of Pennsylvania School of Medicine. She is board certified in pediatrics, adult psychiatry, child and adolescent psychiatry and forensic psychiatry. She is regarded as a national expert in the assessment, counseling and treatment of child victims of sexual abuse.

The Plan of Allocation sets forth the following process by which claims will be presented to and considered by the Claims Administrator: (1) any class member who desires to participate in the settlement must complete and submit a proof of claim form, a confidential class questionnaire, and relevant medical records to the Claims Administrator on or before December 14, 2012; (2) class counsel will submit these forms to the Claims Administrator on behalf of those class members who wish to participate in the settlement and who have completed the forms; (3) the Claims Administrator will evaluate the submitted information in consultation with Dr. Steinberg; (4) if a claimant wishes to meet with the Claims Administrator and/or Dr. Steinberg, such meeting shall be arranged prior to the Claims Administrator assigning the claim to an injury category; (5) upon consideration of the submitted materials, the Claims Administrator shall assign each claimant to an Injury Category (to be described below); (6) the Claims Administrator will assign a dollar allocation of the settlement proceeds to each Injury Cate-

gory after all claims have been assigned to an Injury Category; (7) the amount payable to a claimant shall be determined by dividing the amount allocated to an Injury Category by the number of claimants assigned to that Injury Category (meaning all claimants assigned to an Injury Category will receive the same allocation); (8) the Claims Administrator will notify each claimant of the Injury Category to which their claim was assigned and the amount allocated to him or her; (9) the Claims Administrator may approve an additional allocation to claimants after the initial allocations to the extent there remains unallocated funds in the settlement fund in order to ensure that all funds are allocated to claimants; and (10) the Claims Administrator will hear all appeals by any claimant with respect to either the assignment of an Injury Category or the amount of settlement funds allocated to an individual claim (there shall be no other right of appeal).

Five Injury Categories have been proposed: (1) claimants who present clear and convincing evidence of sexual intercourse as defined by Delaware law;[17] (2) claimants who present significant evidence (as defined) of sexual abuse; (3) claimants who present evidence revealing a reasonable probability of sexual abuse; (4) claimants who present no evidence that would allow one to conclude that the child was abused; and (5) claimants about which the evidence would allow one reasonably to conclude that the child was not abused. These Injury Categories were created in careful consultation with both the Claims Administrator and Dr. Steinberg.

### 4. The Claim For Counsel Fees and Expenses

The class members are represented by elite members of the Delaware plaintiffs' personal injury Bar. Their resumes are impressive and reflect decades of experience prosecuting complex personal injury cases, providing service to the court and the Bar and providing service to their community. To say that these attorneys are among the best of Delaware's best would be an understatement.

Class counsel have entered into contingency fee agreements with all class members who have been interviewed and deemed to have suffered injuries as a result of sexual abuse by Dr. Bradley. These fee agreements call for a fee of 33% of the gross amount recovered by settlement or trial of the plaintiffs' claims. Consistent with this Court's protocol in personal injury cases involving minor plaintiffs, class counsel have reduced their fee request to 25% of the settlement amount, or $30,787,500.00. They also seek reimbursement of their past costs and expenses totaling $856,248.00 and an estimated $1,250,000.00 in costs to be incurred in the future during the claims administration process and in the reimbursement of various liens against the settlement fund.

The steering committee consisted of seven separate law firms. Members of these firms have spent a substantial portion of their professional lives over the past three years interviewing more than seven hundred (700) potential claimants, preparing more than thirty-six hundred (3600) sets of notice materials and then coordinating the delivery of notice to each member of the class both at the class certification and class settlement stages of the litigation, conducting formal and extensive informal discovery, defending and arguing two substantive motions to dismiss involving multiple complex legal issues, attending twenty (20) mediation sessions, engaging in regular conferences amongst counsel at the different firms (at least bi-weekly) to coor-

17. *See* 11 *Del. C.* § 761(g).

dinate litigation and settlement efforts, and developing a settlement structure to address highly unique and sensitive claims on behalf of a class of child victims. All of this work was performed by class counsel at great financial risk as the claims against the Covered Defendants were novel and by no means assured of success.

### D. Preliminary Approval And Notice of The Settlement

On October 5, 2012, class counsel filed a motion for preliminary approval of the settlement in which they introduced the Court to the terms of the settlement and the grounds upon which they would argue that the settlement was fair, reasonable and adequate. As part of this process, class counsel presented a proposed written notice that would be sent to each member of the class that outlined the terms of the proposed settlement and advised of their right to attend and participate in a hearing at which the Court would consider the fairness of the settlement. Class counsel proposed the creation of a qualified settlement fund to be administered by a Trustee, David M. Higgins, Esquire, a tax attorney with substantial experience in the administration of large settlements (including a $600,000,000.00 products liability set-

tlement fund and a $3,000,000,000.00 asbestos settlement fund).

By order dated October 8, 2012, the Court preliminarily approved the proposed settlement, approved the creation of the qualified settlement fund in which the proposed settlement funds could be deposited and protected and set a fairness hearing date of November 13, 2012. The Court also approved the proposed notice of the settlement to the class. In doing so, the Court approved not only the wording of the notice, which spelled out the terms of the settlement in a clear and straightforward manner, but also the time frame in which class members would consider the settlement and determine whether to present objections thereto.[18] In this regard, the Court was satisfied that: (1) the means by which notice would be transmitted to the class, by direct mail (again with the assistance of the Department of Justice and Judge Gebelein) and by publication, both in English and Spanish, was adequate; (2) the settlement appeared sufficiently fair, reasonable and adequate to justify further consideration of the settlement at a fairness hearing; and (3) the thirty-five (35) days provided to class members to consider the settlement and present any objections thereto was adequate.[19]

---

**18.** *See* Del.Super. Ct. Civ. R. 23(d) (directing the court to "requir[e], for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the Court directs to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate ..."); Del.Super. Ct. Civ. R. 23(e)" (requiring that "notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to all members of the class in such manner as the Court directs ..."). The Department of Justice and Judge Gebelein once again coordinated the notice process in the same manner they had employed to give notice of the class

certification. These measures enhanced the effectiveness of the notice and alleviated any due process concerns associated with notice. *See Nottingham P'ners v. Dana*, 564 A.2d 1089, 1097–1101 (Del.1989) (discussing due process requirements for effective notice to the class in opt out and non-opt out class actions); *Turberg v. Arcsight, Inc.*, 2011 WL 4445653 (Del.Ch. Sept. 20, 2011) (same with respect to non-opt out settlement).

**19.** *See In re Coleman Co. Inc. Shareholders Litig.*, 750 A.2d 1202 (Del.Ch.1999) (noting that thirty (30) days was a typical and adequate notice period prior to a fairness hearing); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir.1975) (same); *Miller v.*

## E. The Fairness Hearing

In accordance with the notice of the proposed class action settlement, the Court convened a fairness hearing on November 13, 2012. The hearing lasted approximately five hours during which the Court heard testimony, either directly or through affidavit, from eight witnesses. At the hearing, both class counsel and counsel for all Covered Defendants endorsed the settlement and urged the Court to approve it. As discussed below, Beebe did present an objection to the amount of counsel fees requested by class counsel.

### 1. The Witnesses Testifying In Support of The Settlement

Both mediators, Justice Walsh and Mr. Melnick, testified (Mr. Melnick via affidavit) regarding the extensive negotiations that lead to the proposed settlement. They described the obstacles to settlement, including the complex insurance coverage issues and the many defenses available both to Beebe and the other Covered Defendants. And they described Beebe's precarious financial situation and how the threat of a Beebe bankruptcy filing loomed over the settlement negotiations from the first of the mediation sessions and throughout the mediation process. Having presided for more than a year over the parties' mediation sessions, Justice Walsh offered his opinion that the settlement was fair, reasonable and adequate to all concerned. Mr. Melnick concurred.

The Court also heard from Jeffrey M. Fried. Mr. Fried is President and Chief Executive Officer of Beebe Medical Center and has served in that position since 1995. Beebe is an essential provider of sophisticated health care, including emergency care, in Sussex County serving a patient population of more than 120,000 people and more than 50,000 patients per year. In his testimony, Mr. Fried described Beebe's response to the revelation that a member of its medical staff had perpetrated such horrific abuse upon so many of his patients. To its credit, Beebe quickly determined that it would do all that was possible to address the wrongs that had been committed and to prevent future harm to its patients.

Mr. Fried explained the very real financial implications and consequences of Beebe's decision to accept responsibility for the Bradley matter, including the potential that its lenders may declare an event of default after a decline in Beebe's bond rating. He also described Beebe's difficulty in securing additional funding for daily operations and capital repairs and improvements. Beebe teetered on the brink of bankruptcy and potential ruin given the magnitude of its potential exposure. The settlement—the impetus of which was Beebe's initial cash contribution which then prompted its insurers to come to the settlement table—would provide fair compensation but also ensure that Beebe can survive and continue to provide healthcare to the greater Sussex County community.

Alexander J. Pires, Esquire, an experienced class action attorney, counsel to Beebe and member of its board of directors, reiterated Mr. Fried's testimony regarding Beebe's precarious financial position throughout this litigation. He testified regarding his role in securing expert insurance coverage counsel on behalf of Beebe so that Beebe could fulfill its commitment to accept responsibility for its role in this tragedy. He offered his perspective, as a seasoned class action attor-

*Republic Nat'l Life Ins. Co.,* 559 F.2d 426, 429–30 (5th Cir.1977) (same); *Greenspun v. Bogan,* 492 F.2d 375, 378 (1st Cir.1974)

(same); *Williams v. Vukovich,* 720 F.2d 909, 917 (6th Cir.1983) (same).

ney, regarding the unique nature of this class action involving so many minor victims injured by a single perpetrator and then gave his opinion that the limited fund class action format was the only means by which the parties and the Court could ensure that all victims of Dr. Bradley's abuse are adequately compensated.

James R. Murray, Esquire, an attorney with the Washington, D.C. office of the law firm of Dickstein Shapiro LLP and, as stated, a nationally regarded expert in insurance coverage issues, testified regarding the extensive efforts made on behalf of Beebe to secure insurance coverage for the class plaintiffs' claims. Beebe's insurers raised several legitimate defenses to coverage given the extreme nature of the harm suffered by the class plaintiffs as a result of sexual abuse intentionally perpetrated by a non-insured physician. After extensive negotiations and, as to some insurers, early-stage litigation, the insurers were convinced to contribute substantial funds towards the settlement. Mr. Murray testified, in his opinion, that the insurers have contributed all that it is reasonable to expect them to contribute given the substantial coverage defenses available to them.

Bradley J. Goewert, Esquire, a lawyer with the law firm Marshall, Dennehey, Warner, Coleman & Goggin, expert in the defense of healthcare providers facing tort claims and a professional well-known to and respected by the Court, testified regarding his role as Beebe's defense counsel in this litigation. He noted that his factual and legal research into the class plaintiffs' claims revealed that Beebe had several defenses, both factual and legal, that it could have raised in this litigation. His "marching orders," however, were to "stand down" and let the mediation process run its course. Accordingly, he sought an order of the Court staying discovery pending mediation. That order

was entered. As a result, the class plaintiffs and their families were spared the intrusion of the typical litigation discovery process, including document requests (e.g. for health and school records), depositions and independent medical/psychological evaluations. All efforts by all parties were focused on exchanging the information required to facilitate meaningful settlement discussions and then to conduct those discussions with the necessary constituencies. Remarkably, and to the credit of all counsel involved, patient confidentiality was maintained throughout this process.

The Claims Administrator, Mr. Rutter, described in detail his experience in administering similar aggregated claims of sexual abuse and explained in detail how the claims administration process would work. He also explained the manner in which he would collaborate with Dr. Steinberg as he evaluated individual claims presented on behalf of members of the class. He envisions a process where each claimant will be given a fair opportunity to present all of the information he or she wishes the Claims Administrator to consider, both in writing and in person, in support of the claim before a final decision is made regarding allocations of the settlement fund.

David H. Higgins, Esquire, a tax attorney from California who currently specializes in the administration of large litigation settlement funds, submitted an affidavit in which he explained the role class counsel proposes that he take in the administration of this settlement fund. Specifically, Mr. Higgins explained that he has established, with Court approval, a qualified settlement fund which is designed to maximize favorable tax treatment for the settlement funds and to protect the funds through conservative investments that will match the anticipated liquidity requirements called for by the Plan of Allocation.

## 2. The Objections

The Court received one written objection from a class member in advance of the fairness hearing. The objection was focused solely upon the 25% fee requested by class counsel. The objector did not offer an alternative amount that she thought would be reasonable but did urge the Court to consider that any amount awarded as counsel fees would be that much less available to compensate Dr. Bradley's victims.

Beebe also filed a pre-hearing objection to the amount of fees requested by class counsel. In its filing, Beebe notes that the underlying factual predicate of the class plaintiffs' claims—the extensive abuse perpetrated by Dr. Bradley upon his patients—was carefully and fully exposed by a comprehensive investigation performed under the direction of the Department of Justice. Beebe also points to the fact that this is a limited fund settlement and emphasizes that the needs of the class members (Dr. Bradley's victims) are great. While Beebe commends class counsel for their hard work and the result they have achieved on behalf of the class, Beebe notes that it has been committed from the outset of this litigation to reach a negotiated resolution of the class claims and that the mediation process was, with Beebe's cooperation, efficient and relatively straightforward notwithstanding the complicated coverage issues (which it took the lead in addressing). As Beebe puts it, "[t]o be clear, Beebe opposes the fee requested by Plaintiffs' counsel as unrealistic-not undeserved."

The Court invited members of the class who appeared at the fairness hearing to raise any questions or express any concerns or objections they may have regarding the proposed settlement directly with the Court. Class members in attendance were asked first to identify themselves in writing and to write a summary of their question(s)/concern(s)/objection(s) on a form provided by the Court. The purpose of this was to identify class members who wished to address the Court while at the same time preserving their confidentiality. The Court also identified three members of the plaintiffs' steering committee who would be available during the hearing to answer questions. Upon reviewing the forms, the Court determined that it would be appropriate for the designated steering committee members to speak with those class members who submitted forms because it appeared from the forms that the class members were expressing more questions than objections. After these consultations were completed, and after the Court invited all in attendance who wished to address the Court to come forward, three adult relatives of class members did so.

The first relative of a class member to address the Court expressed concerns regarding the manner in which the press had covered this tragedy. She was particularly critical of the frequency with which Dr. Bradley's photograph and video of him appeared in print and broadcast media. In very powerful and emotional terms she expressed how this tragedy has affected her and her family. She also noted that she had not been clear on the terms and justification for the settlement but allowed that she understood the settlement and reasons for it much better after having listened to the evidence presented at the fairness hearing. She raised no objection.

The next relative of a class member to address the Court expressed concerns that the claims of the most seriously injured victims would be diluted by the claims of those less seriously injured. She also expressed, again in powerful and emotional terms, how this tragedy has affected her family and the entire Sussex County com-

munity. Missing from the settlement, she explained, was any expression of apology from Beebe or the other Covered Defendants. For all of these reasons, she objected to the proposed settlement.

Finally, the Court heard a thoughtful and powerful statement from another close relative of a victim who observed that "no amount of money" can ever fully compensate the victims of Dr. Bradley's barbaric crimes. He urged the Court to ensure that the settlement is structured in a manner designed to "rehabilitate" the victims to the fullest extent possible. He did not, however, object to the settlement as proposed. While victims, upon reaching majority, may use their settlement recoveries as they choose, it is certainly appropriate to hope that they will use these funds for "rehabilitation"—physical, emotional, psychological and/or spiritual—to the fullest extent possible.

## III.

### A. The Settlement Is Fair, Reasonable And Adequate

■ Class actions in this Court are governed by Superior Court Civil Rule 23.[20] Pursuant to Rule 23, the Court engages in a two-step process when determining whether to approve a class action settlement.[21] First, the Court conducts a preliminary review of the proposed settlement to determine if there are patent grounds to question the fairness of the settlement. If not, the Court will preliminarily approve the settlement and schedule a so-called "fairness hearing" at which the Court will receive evidence in support of or opposition to the settlement in order to determine whether the settlement is fair, reasonable and adequate.[22]

■ To make the "fairness" determination the Court should consider several factors, including, *inter alia:* (1) the advantages of the proposed settlement versus the probable outcome of a trial on the merits; (2) the probable duration and cost (here both financial and emotional) of a trial; (3) the extent of participation in the settlement negotiations by class representatives and by a judge or special master (including a retired judge); (4) the number and force of the objections by class members; (5) the effect of the settlement on other pending (or future) actions; (6) the fairness and reasonableness of the claims administration process for individual claims; (7) the apparent intrinsic fairness of the settlement terms; and (8) the extent to which only the class representatives are to receive monetary relief.[23] "There is a presumption in favor of the settlement when there has been arms length bargaining among the parties" after adequate development of the factual record and legal theories.[24] Nevertheless, the "fiduciary nature of the class action requires the Court [ ] to participate in the consummation of the settlement to the extent of determining its intrinsic fairness."[25] After carefully considering the terms of this settlement, the Court has concluded that it

---

**20.** Del.Super. Ct. Civ. R. 23.

**21.** *See Crowhorn v. Nationwide Mut. Ins. Co.,* 836 A.2d 558, 562 (Del.Super.Ct.2003).

**22.** *Id.*

**23.** *Id.See also* MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.62 (Fed. Judicial Ctr.2004) (hereinafter "Manual at ——").

**24.** *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980). *See also Prezant,* 636 A.2d at 921 ("As a general proposition, Delaware law favors settlements.").

**25.** *Id.*

is intrinsically fair, reasonable and adequate and should, therefore, be approved.[26]

## 1. The Advantages of the Settlement Versus Trial

■ The proposed settlement *sub judice* would mark an end to the civil litigation arising from the devastation caused by Dr. Bradley's serial abuse of his patients. This, of course, is beneficial to the Covered Defendants and their constituents. It is also good for the class.

Full-blown litigation and trial posed many risks to class members. Each of the Covered Defendants, including Beebe, had substantive defenses to raise in response to the class claims. Indeed, it is possible, if not likely, that several of the claims would have been dismissed as a matter of law.[27] An even greater risk was posed by the likelihood that litigation would have prompted the insurance carriers for the Covered Defendants, most significantly Beebe's carriers, to stand on their coverage defenses and offer nothing to their insureds or the victims in this case. As explained by Mr. Murray during the fairness hearing, the carriers' defenses were not frivolous. They were grounded in bargained-for policy language and pressed by experienced insurance coverage attorneys. Only the prospect of a full and final settlement of the class claims induced the carriers to participate in mediation and ultimately to contribute substantially to the proposed settlement.

Against the backdrop of the real risks to the class posed by continued litigation, the proposed settlement presents a significantly superior means by which to resolve the class claims. As discussed below, the settlement fund is substantial and the Plan of Allocation is fair.

## 2. The Probable Duration and Cost of Trial

This settlement was reached after careful investigation of the facts but without substantial litigation. Had the parties not reached this settlement, years of heated litigation awaited them. Formal document and deposition discovery would have been costly, intrusive and time consuming. Expert discovery likewise would have taken much time and money. Dispositive motion practice surely would have followed discovery and would have added time to the litigation and burden upon the parties and the Court. If the claims survived dispositive motions, the trial would have been lengthy and unimaginably complex. And then the appeals.... This settlement allows the parties to avoid lengthy (several years at least) and costly litigation in favor of a fair and final resolution now.

Finally, the emotional costs of litigation cannot be ignored. The victims in this case are young, impressionable and already traumatized. Further litigation would exacerbate the trauma and very likely blow the lid off the patient confidentiality that has been so carefully maintained and protected throughout the litigation thus far.

---

**26.** As the Federal Judicial Center's Manual for Complex Litigation explains: "Fairness calls for a comparative analysis of the treatment of class members vis-a-vis each other and vis-a-vis similar individuals with similar claims who are not in the class. Reasonableness depends on an analysis of the class allegations and claims and the responsiveness of the settlement to those claims. Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action process." Manual, at § 21.62.

**27.** *See Doe 30 v. Bradley,* 2011 WL 290829 (Del.Super.Ct. Jan. 21, 2011); *Doe 30 v. Bradley,* 2012 WL 1647849 (Del.Super.Ct. May 8, 2012).

This settlement allows the victims to avoid paying these devastating costs.

### 3. The Participation of a Special Master or Judge in Settlement Negotiations

■ The parties reached this settlement after lengthy arms-length negotiations facilitated by an experienced and highly regarded jurist (with the assistance of a skilled ADR practitioner). Both Justice Walsh and Mr. Melnick endorse the settlement as fair, reasonable and adequate. It is appropriate for the Court to consider the opinions of experienced counsel when determining the fairness of a proposed class action.[28] The view of Justice Walsh and Mr. Melnick from the "front lines" of the settlement discussions between the class plaintiffs and the Covered Defendants and the Covered Defendants and their respective insurance carriers weighs heavily in favor of approval.

### 4. The Number and Force of the Objections

Given the size of the class, the fact that only one class member has come forward to express an objection to the proposed settlement is highly significant.[29] The objection that was raised—that allocation of funds to some victims would lessen amounts received by other victims—strikes at the heart of the principal reason this settlement *is* fair. As explained in more detail below, absent this class action settlement, there is a substantial risk that only those litigants who won the race to the courthouse would recover damages given the limited resources of the Covered Defendants. This settlement ensures that all members of the class with recoverable injuries can receive compensation for their damages.

### 5. The Effect of the Settlement on Pending or Future Actions

There are no other pending actions relating to Dr. Bradley's patient abuse. And, if this settlement is approved, there will be no future actions either. This fact merits careful consideration.

The Court already has recited at length its reasons for certifying this class action under Rule 23(b)(1)(B). Now that the time has come to consider the fairness of the proposed non-opt out settlement of the action, the Court must determine whether the settlement comports with the concerns regarding limited fund settlements expressed by the United States Supreme Court in *Ortiz v. Fibreboard Corp.*[30] There, the Court reversed the trial court's approval of a mandatory settlement on a limited fund theory upon concluding that the proposed settlement had not satisfied the following elements: (1) "the totals of the aggregated liquidated claims and the fund available for satisfying them ... demonstrate the inadequacy of the fund to

---

**28.** *See Alvarado Partners, L.P. v. Mehta,* 723 F.Supp. 540, 548 (D.Colo.1989); *Radosti v. Envision EMI, LLC,* 717 F.Supp.2d 37, 56 (D.D.C.2010) (holding that "[t]he opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'") (citation omitted). *See also Crowhorn,* 836 A.2d at 563 (noting that "arms length bargaining between the parties" after thorough development of the facts gives rise to a "presumption that the settlement is fair, adequate and reasonable.").

**29.** *Id.* (noting that it is appropriate for the Court to consider that "only a few members of the class object and [that] their relative interest is small."). The Court will address the objections to the requested counsel fees separately.

**30.** 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

pay all the claims;" (2) "the whole of the inadequate fund [must] be devoted to [satisfy] the overwhelming claims;" and (3) "the claimants identified by a common theory of recovery [must be] treated equitably among themselves." [31]

While the limited fund in *Ortiz* fell short of each of these elements, the proposed settlement fund *sub judice* satisfies them *seriatim*. First, the available fund, as amply demonstrated by Messrs. Fried, Pires and Murray, is simply inadequate to pay all of the potentially thousands of claims (many of which have astronomical verdict values on their own) that might be presented. Only the earliest-filed of these claims would be satisfied. Second, *all* of the funds (limited as they are), net fees and expenses, will be devoted to compensating eligible members of the class. Nothing will remain after all of the allocations have been made. Third, and finally, the class is comprised of all patients of Dr. Bradley. Thus, each patient will have an opportunity to present a claim to the Claims Administrator who will then employ a fair and transparent Plan of Allocation in order to determine the category of injury within which a claim should be placed and allocate the settlement funds equally to each claimant within the designated category.

Absent a non-opt out settlement, the Covered Defendants would find themselves in the untenable position of having funded all that they are able to fund to this settlement while still facing the possibility of several more claims in the future. The reality is that "any settlement of this litigation would have to afford the defendants 'complete peace' that would include 'a release to the broadest extent possible

under the law.'" [32] Stated differently, "the settlement must either be as broad in scope as the law would allow and bind all class members, or there would be no settlement." [33] The class will receive a substantial benefit from this limited fund settlement that likely would be lost in the absence of a settlement. It is, in this instance, fair and reasonable to forfeit the right of individual class members to opt out of the settlement in order to secure the benefits of what has been offered by the Covered Defendants to the entire class.

### 6. The Fairness and Reasonableness of the Claims Administration Process

The Claims Administrator is honorable, fair and experienced. The Plan of Allocation he will utilize to categorize claims and allocate settlement funds has been developed by applying a tried and true model to case-specific criteria developed in consultation with a renowned expert in child abuse detection and treatment. As Mr. Rutter explained during his testimony, when in doubt, he will err on the side of finding a compensable claim. All victims will be treated equally and will be compensated in accordance with the degree of abuse to which they were subjected.

In advance of the fairness hearing, the Court and parties discussed two concerns with respect to the Plan of Allocation. First, the plan calls for all claims to be filed on or before December 14, 2012. No provision was made for those members of the class who, for extraordinary reasons, were unable to meet that deadline ("late filers"). Second, the plan did not address

---

**31.** *Id.* at 838–39, 119 S.Ct. 2295.

**32.** *In the Matter of the Philadelphia Stock Exch., Inc.,* 945 A.2d 1123, 1137 (Del.2008)

(affirming trial court's approval of non-opt out settlement).

**33.** *Id.*

the scenario in which a victim chooses not to participate in the claims administration process because he or she is showing no symptoms, physical or emotional, of physical or sexual abuse at the time of the claims deadline but develops such symptoms at some time later ("latent injury claims"). After thorough discussions with the parties, both concerns have been addressed.

As to the so-called "late filers" issue, the Plan of Allocation shall be amended to include the following language:

In the event that Class Counsel, the Court or the Claims Administrator receives Claimant Documentation after the Court's deadline of December 14, 2012, but within ninety (90) days of that deadline, the Court shall appoint a special master to review such claims to determine, in his or her sound discretion:

(A) Whether the Claim was late due to extraordinary circumstances, such as military service, extended travel, medical or family emergency, substantial weather event, or any other circumstance that, in the Special Master's discretion, would create an unjust result if the claim was barred for failing to meet the Court's December 14, 2012 deadline; and

(B) Whether the claim was presented before, and in a timely enough fashion so as not to delay, the Allocation described in Paragraph 8 herein.

Claims that are late but that meet these criteria shall be considered as timely filed and shall be included in the Allocation described in Paragraph 8 herein.

This amendment ensures that those who are prevented by extraordinary circumstances from filing their claim by the December 14, 2012 deadline will be permitted to participate in the Claims Administration process as long as the claim is filed within ninety (90) days after the deadline passed and before the Claims Administrator allocates the settlement funds.

As to the latent injury claims, the Plan of Allocation shall be amended to include the following language:

Latent Injury Claims

The Plan of Allocation, as filed on October 5, 2012, anticipated a fund of available settlement proceeds of $89,256,252.00, constituting the $123,000,000.00 of cash contributed to the settlement pool by the defendants and their insurers, less estimated amounts for administrative costs and fees for Plaintiffs' class counsel. The total administrative costs that will be incurred over the course of the settlement will be unknown for some time, and the amount of counsel fees Plaintiffs' class counsel are to be awarded has yet to be determined by the Court. It is recognized by all Parties that each of Bradley's former patients is a member of the Class. The Court and the Parties acknowledge that given the nature of the harm inflicted by Bradley, there is a certain probability that at least some members of the Class, as of the date of this submission and the Court's December 14, 2012 deadline for the submission of Claimant Information, appear or will appear to be symptom-free, and thus may be genuinely unaware of the extent of the injuries suffered as a result of Bradley's abuse. The Court and the Parties further acknowledge that such members of the Class who presently appear healthy may show signs of harm that may only be manifested, and require treatment, at some later time. To ensure that the proposed settlement and Plan of Allocation accounts for the possibility of such latent injury claims, a trust fund shall be set aside for the purpose of

providing treatment for Class members who develop substantiated latent injuries (the "Latent Injury Trust Fund"). The Latent Injury Trust Fund shall be made up of an initial cash amount of $3,000,000.00, allocated from the amount initially set aside for fees requested by Plaintiffs' class counsel, and investment income and other interest earned on those funds. In this manner, the estimated $89,256,252.00 of funds disclosed to the Class members in the notice of the proposed settlement as available for distribution remains unaffected by these proposed additional terms.

Should a member of the Class, over the course of the five (5) years following the Court's approval of the proposed settlement, develop documented symptoms requiring medical or psychiatric treatment that cannot be paid for through any funds allocated to that Class member by the Claims Administrator (either because the funds allocated to that Claimant by the Claims Administrator, pursuant to Paragraphs 8 and 9 of the Plan of Allocation, are insufficient to pay for such treatment, or because the Claimant did not submit Claimant Documentation by the Court's December 14, 2012 deadline and was not granted an exception to that deadline pursuant to Paragraphs 1–2 above), such Class member may apply to the Claims Administrator for funds from the Latent Injury Trust Fund, solely to pay for such treatment. Such funds as may remain in the Latent Injury Trust Fund as of five (5) years following the Court's approval of the proposed settlement shall be distributed to the Class members on a *pro rata basis* consistent with the Initial Allocations made by the Claims Administrator, accounting for the resolution of any appeals made of any such Initial Allocation, as described in Paragraphs 8 and 9 of the Plan of Allocation.

This amendment to the Plan of Allocation sets aside a fund comprised of $3,000,000.00 for a period of five years to address latent injury claims. Any funds not distributed to compensate latent injuries will be distributed on a *pro rata* basis in relation to the amounts originally allocated to those class members whose claims were presented to the Claims Administrator. The life of the Latent Injury Trust Fund is fixed at five years. This time frame is intended to give certain class members an adequate opportunity to identify and assess latent injuries while at the same time providing all members of the class a fixed time frame within which the Claims Administration will operate and then conclude. As with most things, finality is important here.

It is also important to note that the settlement fund presented to the class in the Notice of Hearing On Proposed Settlement will be unaffected because the Latent Injury Trust will be funded solely by amounts designated in the notice for counsel fees. In other words, class counsel (commendably) have compromised their initial fee request in order to facilitate the establishment of the Latent Injury Trust Fund.

The Claims Administration process admittedly is not perfect nor can it be given the age of many of the victims at the time of the abuse and the uncertainty of the prognosis for so many of these children. But the process does not have to be perfect to be fair, and this one is more than fair under the uniquely challenging circumstances at work in this case.[34]

---

34. *See Rowe v. E.I. DuPont de Nemours & Co.,* 2011 WL 3837106 (D.N.J. Aug. 26, 2011) (noting that "[i]f the perfect settlement were [sic] the test for court approval, rarely would a class action settlement be approved.").

### 7. The Apparent Intrinsic Fairness of the Settlement Terms

This is not a class action settlement where class members will receive nebulous forms of non-monetary compensation.[35] The monetary compensation proposed here, $122,150,000.00, is real, substantial money that can do much good for Dr. Bradley's many victims. The settlement fund is comprised of contributions from each of the Covered Defendants that reflect, *pro rata*, each defendant's likely exposure if the case was to proceed through litigation. It is, of course, difficult if not impossible to predict a verdict range for the class claims given the severity and pervasiveness of the abuse on the one hand and, on the other hand, the victim's difficulty, at such a young age, in revealing the extent of the lasting impact of the abuse. The merits of the Covered Defendants' defenses, as stated, also affects the verdict range assessment. Finally, the limited funds available among the Covered Defendants to pay a substantial verdict, if achieved, must also be taken into account.

In consideration of the limited funds available, the extraordinary efforts made by all involved to secure the proposed settlement funds for the class, the uncertainty of the verdict range and the potential strength of the defenses, it would be foolish to deprive the class of the benefits of this settlement. The terms, while not ideal, are fair and reasonable.[36]

### 8. The Extent To Which Only The Class Will Receive Monetary Relief

Pursuant to the clear terms of the proposed settlement, only the members of the class will receive the settlement funds. Aside from Court-awarded counsel fees and expenses, the settlement funds will be allocated to all eligible class members and, through this process, will be exhausted. No funds placed in the settlement fund will revert back to the Covered Defendants. The dedicated medical services to be supplied by Beebe will be provided on a claims-made basis—meaning that services will be provided as claims are made, per the terms of the settlement, until the $1,000,000.00 dedicated for this purpose is exhausted or the prescribed time expires. As to funds used to cover medical expenses, none will revert to Beebe from the settlement fund because none will be placed in the settlement fund for this purpose (the covered medical expenses are separate and in addition to the settlement fund).

For the foregoing reasons, the Court approves the settlement as fair, adequate and reasonable. Having approved a settlement on behalf of a class of minor victims, the Court shall transfer jurisdiction of this matter to the Court of Chancery "for administration of the guardianship pursuant to Chapter 39, Title 12 of the Delaware Code,"[37] or for such other relief

---

35. *See Rinaldi v. Iomega Corp.*, 2001 WL 34890424, at *6–7 (Del.Super.Ct. June 29, 2001) (noting that class action settlements involving "non-cash consideration" should be viewed by the court with reservation and given careful scrutiny).

36. *Id.* (holding that a court "should not withhold approval [of a class settlement] simply because the settlement may not be the best settlement, or a better settlement might have been reached.").

37. Del.Super. Ct. Civ. R. 133(b). The Court notes that Rule 133 addresses the "settlement of a single-transaction matter arising out of a tort claim;" it is silent with respect to the process by which a class action settlement on behalf of a class of minors should be administered. Nevertheless, the Court is guided by Rule 133 and by the statutory scheme vesting jurisdiction for the establishment and supervision of guardianships, and the appointment of guardians, exclusively with the Court of Chancery. *See* 12 *Del. C.* § 3901(a).

in the protection and administration of the settlement funds that court deems just, proper and equitable.

### B. Class Counsels' Fees and Expenses

Class counsel seeks an award of 25% of the gross settlement recovery (or $30,787,500.00). This request reflects an adjustment of the fee agreements entered into between counsel and individual members of the class in which the clients agreed to a 33% fee. The adjustment is in keeping with the typical practice of this Court to approve no more than a 25% counsel fee in connection with the settlement of a minor's personal injury claim. Class counsel also seeks approval of its costs and expenses to date ($818,776.00) plus an additional $1,250,000.00 for future costs and expenses (which include fees for the mediators, the Claims Administrator, Dr. Steinberg, and the professionals who will be engaged to assist in the protection and administration of the settlement fund) and reimbursement of liens (victim's compensation fund, medicaid, etc.). No objection has been raised with regard to class counsels' request for past and future fees and expenses, and the Court sees no basis to deny or reduce the claim. These requests are granted. The request for counsel fees, to which there have been objections raised, merits further discussion.

■ "Class action suits which result in the recovery of money exemplify the class creation of a common fund." [38] The equi-table "common fund" doctrine derives from the notion that those who have benefitted from litigation should share in its cost. [39] In the class action context, the cost of the litigation, including counsel fees, are paid out of the common fund, in this case, the settlement fund. [40] As our Supreme Court has noted:

> [A] request for an award of attorneys' fees from a common fund must be subjected to the same heightened judicial scrutiny that applies to the approval of the class action settlement.... The Court [ ] must make an independent determination of reasonableness on behalf of the common fund's beneficiaries, before making or approving an attorneys' fee award. [41]

■ In Delaware, the courts are not bound by a particular methodology in determining appropriate counsel fees under the common fund doctrine. [42] Rather, our courts employ the following so-called *Sugarland*[43] factors to reach "an equitable award of attorney fees: (1) the results achieved; (2) the time and effort of counsel; (3) the relative complexities of the litigation; (4) any contingency factor; and (5) the standing and ability of counsel involved." [44] "Delaware courts have assigned the greatest weight to the benefit achieved in litigation." [45] To the extent the benefit achieved is quantifiable, then it is typical for Delaware courts to apply a "percentage-of-the-benefit approach" to reach an equitable fee award. [46] The Court will follow that approach here.

**38.** *Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039, 1044 (Del.1996).

**39.** *Id.; Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1253 (Del.2012).

**40.** *See Crowhorn,* 836 A.2d at 564.

**41.** *Goodrich,* 681 A.2d at 1044.

**42.** *Americas Mining,* 51 A.3d at 1254.

**43.** *Sugarland Indus., Inc. v. Thomas,* 420 A.2d 142 (Del.1980).

**44.** *Americas Mining,* 51 A.3d at 1254.

**45.** *Id.*

**46.** *Id.* at 1255.

### 1. The Results Achieved

■ The Court already has concluded that the settlement achieved by class counsel on behalf of the class is fair, adequate and reasonable. The settlement provides a sizeable fund to compensate all victims injured by Dr. Bradley's abuse through an orderly Claims Administration process. And it marks a welcomed early end to litigation that, once fully activated, would have caused great distress to class members, given the tender age of the victims and the vulgar nature of Dr. Bradley's treatment of them. The benefit to the class is substantial.

Having said this, in determining the extent to which the result or benefit achieved supports an award of counsel fees it is appropriate for the Court to consider whether the class representative and her attorneys "can rightly receive all credit for the benefit conferred...." [47] In this regard, the Court cannot ignore that the essential factual predicate underlying the class claims—that Dr. Bradley abused his patients—was thoroughly investigated and proven beyond doubt by the Department of Justice. It was from this already established platform that the class plaintiffs were able to launch their claims against the Covered Defendants.

Once the claims were launched, and from the outset of this litigation, the class plaintiffs found an acquiescent if not, at times, cooperative adversary in Beebe. Beebe quickly advised all concerned that it was prepared to accept responsibility for the fact that Dr. Bradley perpetrated this horrible abuse on Beebe's watch. Beebe engaged expert coverage counsel and im-mediately focused on getting its insurers to the bargaining table with "real money" that would supplement the more than six million dollars it had already put on the table. As Beebe was working to secure insurance coverage, it agreed to stay formal discovery and to facilitate an informal exchange of information that would spare the class plaintiffs the cost and trauma of full-blown litigation. And, to its credit, it sat on its hands rather than join the other Covered Defendants as they pursued dispositive motion practice. Through these efforts and strategic decisions that worked to the benefit of the class, Beebe itself contributed to the benefit achieved for the class through this settlement.

### 2. The Time and Effort of Counsel

That the Court has discussed other factors that contributed to this settlement should not be interpreted as a suggestion that class counsel has not performed at the highest level known to the legal profession with diligence, courage and fortitude. They have done this and more.

The steering committee consisted of seven law firms. Although no attorney time records have been submitted to the Court, it is reasonable, given the Court's close involvement with this litigation, to accept counsels' representation that they have collectively "devot[ed] a substantial part of their professional lives to this litigation." [48] Remarkably, class counsel met individually with more than seven hundred (700) members of the class.[49] These meetings were physically and emotionally exhausting for all concerned. Counsel devised an elaborate plan to effect direct notice to each of the thousands of class members while, at

**47.** *Dias v. Purches*, 2012 WL 4503174, at *5 (Del.Ch. Oct. 1, 2012).

**48.** Plaintiffs' Memorandum of Law In Support of Attorneys' Fees and Expenses, at 9.

**49.** An unfortunate reality of many if not most class actions is that class counsel rarely have an opportunity to meet directly with large segments of the class they represent. *See* Manual, at § 21.3.

the same time, managing to preserve patient confidentiality for each child. And, importantly, they prepared for and participated in multiple mediation sessions over a period of seventeen months. Their diligence in these efforts yielded steady improvements in the nature and quality of the defendants' settlement offers.

It is clear to the Court that class counsels' skill, tenacity and commitment to their clients played a significant role in the insurers' assessment of risk and decision to contribute so substantially to the settlement. Bottom line: class counsel "fought the good fight" on behalf of the class and they won it.

### 3. The Relative Complexities of the Litigation

At first glance, the claims raised by the class do not appear terribly complex. For the most part, they sound in common law negligence and rest on relatively straight forward factual assertions. But there was much more to the claims than first meets the eye. First, the class plaintiffs attempted to invoke certain statutory sexual abuse reporting schemes as a basis to argue negligence *per se*.[50] This theory was novel and complex and was tested in two hotly contested rounds of dispositive motion practice. Second, and even more challenging, the class was comprised entirely of young children, many so young that they were unable to communicate the extent of any abuse they may have suffered or any lasting effects of such abuse. Third, and finally, class counsel had to become familiar with complex issues of insurance coverage so that they could meaningfully respond to Beebe's carriers' initial refusal to participate in settlement discussions. The litigation was complex and challenging and class counsel met the challenge.

### 4. The Contingency Factor

Class counsel bore the entire financial risk of undertaking this litigation. And the risk was substantial. During the entirety of this litigation, the primary defendant, Beebe, was in a precarious financial condition and threatening to seek bankruptcy protection. For most of the litigation, Beebe's insurance carriers took a "no pay" position, meaning they made clear they would offer nothing towards a settlement. All of the Covered Defendants had substantive defenses to the class claims, both legal and factual, that could have resulted either in dismissal of the claims or a finding of no liability after trial. This was no "slam dunk." Notwithstanding these risks, class counsel spared no expense in their commitment of time and resources to the prosecution of the class claims.

The fee agreements that counsel reached with certain members of the class contained a 33% contingency fee arrangement. In keeping with this Court's protocols with regard to settlements of personal injury claims on behalf of minors, class counsel have reduced their fee request to 25% of the gross recovery.

### 5. The Standing and Ability of Counsel Involved

The Court will refrain from "gushing." Suffice it to say, the plaintiffs' steering committee, across the board, is comprised of trial lawyers well known to the Court. They are among the best in the Delaware Bar and the best in the country. It was a privilege to watch them in action in this difficult case.

### 6. The Percentage of the Benefit To Be Awarded

The fee agreements entered into by and between class counsel and their clients

---

**50.** *See* 24 *Del. C.* § 1731A et seq.; 16 *Del. C.* § 903 et seq.

called for a 33% contingency fee.[51] Class counsels' petition for fees reduced the agreed-upon 33% fee down to a 25% fee. After further discussion among the Court and all counsel, class counsel have reduced their fee request to 22.5%. This reduction in the fee request is appropriate given the Department of Justice's and Beebe's role in achieving the benefit for the class and the needs of class members. Upon applying the *Sugarland* factors, as discussed above, the Court has determined that an award of counsel fees representing 22.5% of the common fund ($27,708,750.00) is appropriate. Not only is this amount in line with fees awarded in other class action litigation involving horrific injuries,[52] it also is in line with fees approved upon the settlement of other class actions in this Court and the Court of Chancery.[53]

## IV.

The approval of this class action settlement marks the end of litigation arising from Dr. Bradley's fifteen year reign of terror and abuse in Sussex County, Delaware. Although no amount of monetary or non-monetary compensation can atone for Dr. Bradley's atrocities, the settlement approved today provides Dr. Bradley's victims with means by which to facilitate the healing process. It is not for this Court to tell this class of innocent victims, or the greater Sussex County community, how to go about the physical, emotional and spiritual healing that all who have followed this case so sincerely wish for these children and their families. With criminal and civil litigation behind them, however, all focus can now be placed on picking up the pieces as best as possible. "In the deserts of the heart, let the healing fountain start."[54]

A separate order implementing the terms of the settlement as approved will be entered forthwith upon presentation by the parties.

**IT IS SO ORDERED.**

---

**51.** *Cf. In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 821–22 (3d Cir.1995) (noting that contingency fee agreements are not controlling when determining a percentage-of-recovery fee under a common fund theory).

**52.** *See e.g. In re Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) (awarding counsel fees of 33.3% of the gross settlement amount); *In re Zyprexa Products Liab. Litig.,* 424 F.Supp.2d 488 (E.D.N.Y.2006) (approving counsel fees in "quasi-class action ranging from 20% to 35% depending on the size of the individual settlements)".

**53.** *See e.g. Sugarland,* 420 A.2d at 150–51 (approving a fee of 20% of the common fund); *Crowhorn,* 836 A.2d at 566 (approving a fee of 33% of the common fund).

**54.** W.H. Auden, In Memory of W.B. Yeats.