# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| GARY and ANNA-MARIE CUPPELS, individually and on behalf of all others similarly situated, | : <br> : <br> : C. A. No.: S18C-06-009 CAK <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| MOUNTAIRE CORPORATION, an Arkansas corporation, MOUNTAIRE FARMS, INC., a Delaware corporation, and MOUNTAIRE FARMS OF DELAWARE, INC., a Delaware corporation, | : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

Submitted: March 23, 2021
Decided: April 12, 2021

## MEMORANDUM OPINION AND ORDER

*Stipulated Motion to Approve Class Action Settlement*

## GRANTED

Chase T. Brockstedt, Esquire and Stephen A. Spence, Esquire, Baird Mandalas Brockstedt, 1413 Savannah Road, Ste. 1, Lewes, Delaware 19958, Attorneys for Plaintiffs.

Philip C. Federico, Esquire and Brent Ceryes, Esquire, Schochor, Federico and Staton, P.A., 1211 Paul Street, Baltimore, Maryland 21202, Attorneys for Plaintiffs.

F. Michael Parkowski, Esquire and Michael W. Teichman, Esquire, Parkowski, Guerke & Swayze, P.A., 1105 North Market Street, 19th Floor, Wilmington, Delaware 19801, Attorneys for Defendants.

Lisa C. McLaughlin, Esquire, Todd L. Goodman, Esquire and John C. Phillips, Jr., Esquire, Phillips, Goldman, McLaughlin & Hall, P.A., 1200 North Broom Street, Wilmington, DE 19806, Attorneys for Defendants.

James R. Wedeking, Esquire, Timothy K. Webster, Esquire, Gordon D. Todd, Esquire, Erika L. Maley, Esquire and Daniel J. Hay, Esquire, Sidley Austin, LLP, 1501 K Street, N.W. Washington, DC 20005, Attorney for Defendants.

**KARSNITZ, J.**

The Town of Millsboro sits on the Indian River in the shadow of the chicken processing facility a few miles east of it. For many years the plant was the only facility between Rehoboth and Millsboro. The plant has been operated by Defendants Mountaire Farms, Inc., a Delaware corporation, Mountaire Farms of Delaware, Inc., a Delaware corporation, and under the auspices of Mountaire Corporation, an Arkansas corporation (collectively "Defendants" or "MFODI").

In June of 2018, Plaintiffs Gary and Anna-Marie Cuppels sued the Defendants in their own right and on behalf of the class of all similarly-situated persons. Plaintiffs allege that Defendants disposed of contaminated wastewater and liquefied sludge on lands near Plaintiffs' residences. Plaintiffs allege that this wastewater and sludge have seeped into the groundwater throughout the area, causing nitrates and other contaminants to enter Plaintiffs' drinking water wells, resulting in health effects and property diminution for a class of individuals living, working, leasing, or owning property and/or businesses in the area identified as the "Groundwater Area" set forth on Exhibit A to the Motion for Approval.

Plaintiffs further allege that Defendants' wastewater treatment plant and their spray irrigation and sludge operations emit air pollutants, including malodorous hydrogen sulfide that reach Plaintiffs' residences at levels causing a class of individuals living, working, leasing, or owning property and/or businesses

3

in the area identified as the "Air Area" set forth on Exhibit A to the motion to suffer health effects and to endure nuisance conditions preventing and devaluing the use of their properties.

Defendants deny Plaintiffs' allegations. Specifically, Defendants assert that they are not the cause of nitrate contamination in residential supply wells and that they did not emit and are not emitting air pollutants in the nature and quantity alleged by Plaintiffs. Defendants further assert, among other defenses, that Plaintiffs cannot establish that Defendants' actions are the proximate cause of Plaintiffs' injuries. Defendants have chosen to settle the case in order to achieve final resolution of this matter and avoid the uncertainty associated with litigation.

After the filing of the Complaint, the parties litigated numerous dispositive motions and engaged in preliminary discovery on issues of class certification and jurisdiction. In August 2019, the Court granted the parties' request to stay the case while they pursued mediation. The parties engaged the services of two well-respected mediators: David White, an attorney and mediator with extensive experience litigating and mediating cases, and Eric Green, a mediator with extensive experience mediating class actions of national prominence, including environmental matters. The parties mediated over four days

4

in Wilmington, Delaware. This mediation included presentations from both parties and their experts. The mediation was not successful.

Following the parties' initial attempt at mediation, this Court authorized discovery on the merits of the case, and the parties resumed briefing on class certification and certain dispositive motions. The parties and the Special Discovery Master implemented an electronic discovery protocol, and over the following months, the parties produced and reviewed hundreds of thousands of pages of documents. Discovery also involved multiple site inspections both at the Facility as well as the residences of class members, the scope and procedures of which were litigated before the Special Discovery Master. The parties engaged in over 20 discovery depositions, including the depositions of corporate designees, class representatives, unnamed class members, an expert witness, and Defendants' current and former employees (and many more depositions remain pending). The parties litigated numerous discovery disputes through the Court-appointed Special Discovery Master and before this Court. The parties continued to discuss settlement in 2020, as an extension of the mediation that began in 2019. Ultimately, in late 2020, the parties reached agreement and entered into the proposed Settlement Agreement.

On December 23, 2020, the parties filed a Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Other Relief (the "Preliminary Approval Motion").[1] In addition to seeking preliminary approval of the Settlement Agreement, the Preliminary Approval Motion requested that the Court (1) preliminarily certify the settlement class; (2) appoint class representatives; (3) appoint Plaintiffs' counsel as Class Counsel; (4) designate RG/2 as Claims Administrator; (5) approve and order the implementation of a proposed Notice Plan; (6) establish a procedure for objections to the Settlement Agreement; (7) establish a procedure for opt-outs from the Settlement Agreement; (8) set a bar date for the submission of claims; and (9) schedule a briefing schedule and date for a fairness hearing to consider final approval of Settlement Agreement.

On January 11, 2021, the Court granted the Preliminary Approval Motion.[2]

Following preliminary approval, Class Counsel directed class notice through RG/2 Claims Group pursuant to the Court-approved notice plan. The notice campaign was robust. RG/2 Claims mailed the Notice to 6,720 Class

---

[1] D.I. 605.

[2] D.I. 610.

6

Members identified via property records.[3] Further, the Class Counsel engaged in a publication notice campaign, which included advertisements in multiple newspapers, as well as a press release that generated news coverage in multiple media outlets. Class Members were also provided with a toll-free number and an informative website to obtain case-related documents and further information regarding the proposed Settlement (www.mountairesettlement.com). Both the direct and publication notices provided the Settlement Class Members with information on how they could review a copy of the Settlement Agreement, the deadline by which they were required to file any objections to the Settlement Agreement, their right to exclude themselves from any settlement and the deadline for doing so, the potential preclusive effect of the Settlement Agreement, instructions on how to register for participation in the Settlement Agreement, and a bar date for the submission of claims.

Class Member response has been overwhelmingly positive. Since the initiation of notice, over 3,000 Class Members have registered claims. No Class Members are objecting to the Settlement Agreement. Four individuals filed letters styled as objections. The individuals are not in the class as Plaintiffs.

---

[3]Declaration of Melissa Baldwin, attached as Exhibit B to the Motion.

7

The parties now seek final approval of the Settlement Agreement and other related relief necessary to implement the terms of this settlement.

**Terms of Settlement Agreement**

The proposed Settlement Agreement requires Defendants to pay $65 million cash in full satisfaction of Plaintiffs' claims, including all legal fees, costs, and expenses (including costs and expenses of administering the settlement fund described below). The payment is required to be made in two installments: one payment of $55 Million by December 31, 2020 and a second payment of $10 Million by December 31, 2022. Defendants have already made the first payment, which is held by an independent escrow agent pursuant to the Settlement Agreement.

Contemporaneously with the filing of this Motion, Plaintiffs have moved for the establishment of a Qualified Settlement Fund (the "QSF") to receive the settlement proceeds (the "QSF Motion"). The QSF will be funded with those proceeds currently held in escrow pending approval of the proposed Settlement Agreement and the entry of the First Amended Consent Decree in the Federal Case ( as defined below) as well as the second payment due at the end of this year, as described above. Following this Court's approval of the QSF Motion, the QSF will be allocated and amounts will be distributed to Class Members in accordance

8

with the Allocation Plan described briefly below and further detailed in Exhibit C to the motion. Legal fees, costs, expenses, and any liens will likewise be subject to the approval of this Court prior to payment from the QSF.

**Settlement Class Definition**

Plaintiffs' proposed class definition is as follows:

All Persons who, on or after May 1, 2000, owned, leased, resided on, or were employed on a full-time basis at: (a) property located in whole or part within the Groundwater Area, which is geographically bounded by the solid blue line on Exhibit A, and not the Air Area, which is bounded by the dashed red line on Exhibit A; (b) property located in whole or part within the Air Area, but not the Groundwater Area; and (c) property located in whole or part within both the Groundwater Area and the Air Area.

Excluded from the class definition are: (1) Defendants; (2) any entity in which Defendants have a controlling interest; (3) any person with an ownership interest in Defendants; (4) any current or former officer or director of Defendants; (5) any current or former employee of any Defendant for any potential exposure during their employment by such Defendant; (6) persons who have entered into separate settlement agreements with any Defendant related to claims similar to those claims made in the action; and (7) the legal representatives, successors, or assigns of Defendants.

The Groundwater Area has been defined as the area overlying the groundwater contamination plumes alleged to have been caused in whole or in part by Defendants. The Groundwater Area was developed by Plaintiffs' expert witness, Dr. Harvey Cohen, a hydrogeologist with more than 20 years of contaminant fate and transport experience. Dr. Cohen reviewed dozens of reports and models related to the groundwater near the Defendants' facilities and plotted nitrate and water levels in hundreds of monitoring and residential wells upgradient and downgradient of Defendants' spray irrigation and sludge fields. Based on hundreds of hours of analysis and groundwater "particle tracking" by Dr. Cohen and his colleagues at S.S. Papadopoulos & Associates, Dr. Cohen would testify that this area has been or soon will be impacted by Defendants. Dr. Cohen's report describing the methodology utilized to reach these conclusions is included as Exhibit D to the motion.

As to the Air Area, Plaintiffs allege Defendants' conduct caused multiple exceedances of the Delaware Air Quality Standard for hydrogen sulfide and exceedances of the health standard established by the Agency for Toxic Substances and Disease Registry ("ASTDR") for ammonia and other air pollutants that, in the aggregate, are believed to be sufficient to potentially affect human health or cause property damage. The Air Area of potential hydrogen sulfide air

exposure has been modeled by John Purdum, an expert in Environmental Protection Agency ("EPA") air modeling techniques, based on EPA modeling protocols and emissions. Mr. Purdum's report describing the methodology utilized to reach these conclusions is included as Exhibit E to the Motion. Glen Adams' report describing how Mr. Purdum's calculations were used to generate the class map is attached as Exhibit F to the Motion.

As set forth in the accompanying declaration of Plaintiffs' expert in medical toxicology, William Meggs, M.D., attached as Exhibit G to the Motion, the Air Area encompasses the area over which Class Members could have been exposed to hydrogen sulfide emissions from Defendants' operations sufficient to cause health effects, to a reasonable degree of medical probability. Those outside this area would not, to a reasonable degree of medical probability, have been exposed to sufficient levels of pollutants from Defendants' operations to permit Dr. Meggs to conclude that those individuals suffered health effects as a result of Defendants' operations. Additionally, as described in the declaration of Plaintiffs' expert in property diminution, Ken Acks, attached as Exhibit H to the Motion, the Air Area also encompasses all properties that could, to a reasonable degree of probability, have experienced a diminution of property value as a result of Defendants' emissions.

11

### Allocation of Settlement Proceeds

Plaintiffs have proposed that a Claims Adjudicator be retained for the allocation of the proceeds of the Settlement Agreement. Specifically, Plaintiffs have proposed, and Defendants have consented to, the Hon. Irma Raker (Ret.) serving as Claims Adjudicator.

Judge Raker has extensive class action allocation experience, having recently led the distribution of settlement proceeds from a $190 million settlement to approximately 9,000 claimants in *Jane Doe No. 1, et al. v. Johns Hopkins Hospital, et al.*, No. 24-C-13- 001041 (Md. Cir. Ct. 2014). Judge Raker has also served as an Associate Judge of the District Court of Maryland, Montgomery County from 1980 to 1982, Associate Judge of the Circuit Court for Montgomery County, Maryland from 1982 to 1992, and on the Maryland Court of Appeals from 1994 until her retirement in 2008.

The Claims Adjudicator will evaluate each claim and categorize each claimant to determine fair, reasonable, and equitable compensation based upon the established categories of damages and the Allocation Plan, attached as Exhibit C to the Motion. In doing so, the Claims Adjudicator will utilize the injury categories and additional factors noted in the Allocation Plan. Following notification to each claimant of their allocation, a period will be provided during

12

which each claimant may appeal to the Claims Adjudicator before the allocation becomes final. An estimate of Judge Raker's fees in connection with this service is provided as Exhibit I to the motion.

Plaintiffs further request the continued appointment of RG/2 as Claims Administrator. RG/2 will assist Judge Raker in the administration of the settlement program, including issuing necessary mailings, data entry, developing and maintaining access to databases, managing documents provided in support of claims, and providing other services necessary to implement the settlement program. An estimate of RG/2 fees in connection with this service is provided within Exhibit B to the motion.

**The Federal Case**

There is a pending matter in the United States District Court for the District of Delaware that relates to the proposed Settlement Agreement: *Delaware Department of Natural Resources and Environmental Control v. Mountaire Farms of Delaware, Inc.* 1:18-cv-00838 MN-JLH (the "Federal Case"). The Cuppels, individually, and Plaintiffs' Counsel have been engaged in litigation as intervenors before the U.S. District Court for the District of Delaware in the Federal Case. The Federal Case involves claims raised by DNREC against Mountaire Farms of Delaware, Inc. ("MFODI") under federal law related to alleged violations and

contamination at the Facility. The claims at issue in the Federal Case are premised on some of the same operative factual allegations as the claims in this matter. In the Federal Case, DNREC and MFODI entered into a proposed consent decree, and then a First Amended Agreement and [Proposed] Consent Decree ("First Amended Consent Decree") that requires MFODI to (a) make certain Facility improvements to prevent future groundwater contamination; and (b) engage in certain efforts to remove existing nitrate contamination from the groundwater, among other terms and conditions. The Cuppels, as intervenors in the Federal Case, raised objections to the Consent Decree as originally proposed as well as the First Amended Consent Decree. The Cuppels also moved for a preliminary injunction in the Federal Case, seeking a suspension or curtailment of MFODI operations.

Contemporaneously with the settlement of this class action case, the Cuppels intervenors and MFODI have entered into a separate confidential settlement agreement in the Federal Case to resolve the intervenors' claims in that case, including its motion for preliminary injunction and its opposition to the First Amended Consent Decree. Pursuant to that agreement, intervenors anticipate that they will withdraw their objections and ask the Federal Court to enter the First Amended Consent Decree, and that MFODI will be required to engage in certain

14

additional activities to prevent future harm to the groundwater and provide residents an avenue to report and receive follow-up on air pollution complaints. The Parties estimate that the aggregate value of MFODI's commitments, including under the First Amended Consent Decree, is expected to be approximately $120 million for incurred and contracted costs, exclusive of long-term operation and maintenance and contingencies that the intervening Cuppels value at an additional $20 million. These remedies are not included as part of the Settlement Agreement in this matter, and Intervenors' Counsel (Class Counsel here) will not be requesting a legal fee, costs, and expenses for the Federal Case in connection with this resolution of this matter, as the legal fees, costs, and expenses related to the Federal Case have been separately negotiated.

Payment of the Settlement Amount in this case is contingent on entry of the First Amended Consent Decree (or any successor thereof) in the Federal Case, which is anticipated to occur shortly following final approval of this Settlement Agreement, if approved, if not sooner. Defendants shall not be entitled to a return of any portion of the Settlement Amount if both the proposed Settlement Agreement is finally approved and the First Amended Consent Decree is approved and entered in the Federal Case. However, if the Court does not enter final approval of the Settlement Agreement, if the Court's final approval of the

Settlement Agreement is overturned on appeal, or if the First Amended Consent Decree is not entered in the Federal Case, the Settlement Amount shall be returned to Defendants, together with any interest or other gains that have accrued on each of their respective contributions, less permissible notice and administrative expenses incurred subsequent to preliminary approval of the proposed Settlement Agreement.

## THE NOTICE PLAN

Delaware Superior Court Civil Rule 23(c)(2) requires that when a class is certified under Rule 23(b)(3), as here, the "Court shall direct to the members of the class the best notice practicable under the circumstances",[4] describing the right of exclusion from the class; the potential preclusive effect of the settlement, and the right to enter an appearance through counsel. In the case of settlement, Delaware Superior Court Civil Rule 23(e) further requires that "notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to all members of the class in such manner as the Court directs" of any class action settlement.

---

[4]Rule 23 (c)(2).

The Court approved Plaintiffs' proposed Notice Plan, finding it was consistent with Rule 23(c)(2), represented the best practicable notice under the circumstances, and was reasonably calculated to apprise Class Members of the facts of this litigation and their rights with respect to the Settlement Agreement.[5]

Class Counsel complied with this Court Order by directly mailing notice of the proposed Settlement to over 6,720 current and former residents within the Class Area.[6] Similarly, Class Counsel provided publication Notice through newsprint advertisements and an internet site in a manner consistent with the Notice Plan.[7] Having provided Notice to the Class Members in the manner directed by the Court, Plaintiffs have satisfied Rules 23(c)(2) and 23(e). I find that Class Counsel provided sufficient notice of the Settlement Agreement to Class Members.

---

[5]D.I. 610.

[6]Declaration of Melissa Baldwin, attached as Exhibit B to the Motion.

[7]*Id.*

## APPROVAL OF THE SETTLEMENT

In order to prove a class action settlement agreement, I must first determine that the four requirements of Superior Court Civil Rule 23(a) have been met.[8] If I am satisfied then I must find the proponents of the settlement have satisfied requirements of Superior Court Civil Rule 23 (b). I preliminarily found the dictates of Rule 23 had been satisfied in my order in January of this year. Nothing has changed my mind. The case could not have been practically litigated as individual actions. The complexities and expense would have overwhelmed any recovery for even the most seriously damaged Plaintiff. The liability issues are complex and similar and typical to each case. The number of claims exceed six thousand. The class representatives have shown to be competent to represent the class, and have vigorously litigated the case with counsel from experienced class action litigators. The class has been ascertained by qualified experts.[9] In short, all of the elements necessary to class certification exist. In my view the question is not close. Class litigation is appropriate and necessary pursuant to Superior Court Civil Rule 23(b)(3).

---

[8]*Crowhorn v. Nationwide Mut. Ins. Co.*, 836 A.2d. 558 (Del. Super., Nov. 6, 2003) ("*Crowhorn*").

[9]*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013). See also *Bentley v. Honeywell, Intern., Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004).

## THE SETTLEMENT IS FAIR

It is always difficult to determine if enough is enough in any settlement. Arguments can always be made that settlement amounts should be larger. The difficulty is exacerbated where, as here, significant liability issues exist. Defendants, as is their right, have vigorously defended the case. Defendants contested nearly everything, including raising both personal and subject matter jurisdictional defenses. Defendants sought to certify for appeal the subject matter jurisdictional issue at the time the parties agreed to settlement of the case. Had Defendants been successful on their liability defenses, Plaintiffs would have received nothing.

From a judicial perspective I find it difficult to evaluate liability issues prior to trial. Here experienced trial counsel decided the settlement amount is fair. The amount is substantial. I also am persuaded by and take comfort from the affidavit of Eric D. Green, Esquire. Mr. Green is a full-time mediator with Resolutions, LLC, an ADR firm located in Boston. He was also a long-time professor at Boston University School of Law teaching *inter alia*, ADR methods and resolution of mass torts. Mr. Green and David White, Esquire, well known to me for his ADR skills, conducted the mediation in this case. In an affidavit provided by Mr. Green he tells me both sides to this case diligently, skillfully and

19

professionally conducted the mediation. Most importantly he tells me the settlement is fair. I agree.

In *Jane Doe 30's Mother v. Bradley*[10] the Court applied a two-step process to its fairness analysis. The Court first conducts a preliminary review to determine any patent grounds to question the fairness. I have done that here and found none.

Second, the Court is required to conduct a fairness hearing to receive evidence in support or in opposition to the settlement. We have done that today, and I find that under all relevant factors the settlement is fair. I reviewed the following:

(1)    the advantages of the settlement as opposed to to the outcome at trial;

(2)    duration and costs of trial;

(3)    extent of participation in settlement negotiations by class representatives and by special master;

(4)    number and force of objections by class members;

(5)    effect on other actions;

(6)    fairness of the claims administration process;

(7)    intrinsic fairness of the settlement terms; and,

---

[10] 64 A.3d 379 (Del. Super., Nov. 19, 2012).

20

(8)    extent class representatives only get
monetary relief.[11]

Here all factors are met, but several deserve comment.  The settlement

amount is substantial.  Liability is significantly at issue, and success at trial is

subject to doubt.  The length and expense of trial and potential appeals are

enormous.  No class members are objecting to the settlement.  Finally, the

monetary relief will be administered through a comprehensive claims process to

share the fruits of the efforts with all class members after evaluating each class

members' damages.

## NON-CLASS MEMBERS OBJECTIONS

A relatively small number of non-class members object to the

settlement because they are not within the designated class area.  Their

disappointment in being excluded is obvious and understandable.  They have no

standing to object.[12]  Plaintiffs proposed and I certified a geographic class

configuration.  Experts determined the boundaries of the class through painstaking

work using scientific methods.  Because of the settlement I was unable to evaluate

the methods through the litigation process.  Two points standout.  First,

---

[11]*Crowhorn*, supra.

[12]*Marie Raymond Revocable Trust v. MAT Five, LLC* 980 A.2d 388 (Del. Ch. 2008); see
also *Jane Doe 30's Mother v. Bradley*, 64 A.3d 379 (Del. Super., Nov. 19, 2012).

21

Defendants opposed the geographic limits of the class advocating for much smaller sizes to the air and water pollution areas. Thus, if the parties had fully litigated the case, the area designating the class would have not grown larger, and well may have diminished.

Second, I have reviewed the qualifications of Plaintiffs' experts, and their reports. The experts are well qualified, their work detailed, and they relied upon established scientific principles.

The non-class member objectors ("commenters") raise all sorts of speculation about their exclusion. They claim, among other things, individuals were excluded to benefit business interests. No facts or other basis exists to support this contention.

One other claim is worth comment. The "commenters" contend that class counsel never intended to see the case through, and were seeking a quick settlement which was in Class Counsel's interest. I need only point to Class Counsel's substantial effort in time, and expenditure of money in costs to refute this claim. I saw the vigorous and determined work of Class Counsel expended to prove the case, in the face of an equally determined defense. Class Counsel's work was the opposite of a sell out.

Lawyers presenting a case like this must necessarily rely upon expert witnesses to determine the scope of the harm. In particular here, and in addition to the experts who opined on the geographic breadth of the pollution, Class Counsel consulted a well-qualified toxicologist and medical expert, William Meggs, M.D. Dr. Meggs provided his opinion in the negative: he cannot say to a reasonable degree of medial probability that any health issues of those outside the designated geographic area are the result of exposure to toxic chemicals allegedly caused by Defendants. In short, the evidence failed to prove a case for those outside the geographic area.

No doubt the commenters do not accept the expert conclusions and will forever rely upon their intuition. This settlement does not prejudice their right to prove otherwise. I understand commenters' disappointment in not being the beneficiaries of fruits of this case. Class Counsel, and ultimately this Court, must follow the evidence which led to their exclusion.

## RELATED MATTERS

1. **Attorneys' Fees and Costs.**

Class Counsel requests that I approve payment of the litigation expenses and attorneys' fee of 25% of the settlement amount. This level percentage fee is consistent with, and at the low end of the standard in tort cases.

23

This type of request always raises the temptation to limit the fee to benefit the class, and at the expense of the attorneys. The temptation increases with the size of the settlement. I am going to resist the temptation and approve the fee request.

Class Counsel provided me a report from an expert in the field expressing the opinion the fee request is appropriate. The report is not all that helpful. What I do find helpful and important is my review and analysis of this case. In my view the liability of Defendants was always a serious issue and question. The costs of proving liability was enormous. Class Counsel spent millions of dollars of their money in their efforts. The potential for no recovery for the class and Class Counsel was very real.

Class Counsel worked diligently and professionally to bring about what to me is a remarkable result. They faced formidable opposition who contested everything, at least one time in a way that, for me, was beyond reasonable boundaries. This Court wrote no less than ten (10) full opinions on important and potentially case dispositive issues. I point that out not as a pat on the back to the Court - the work is our job and responsibility. But preceding each opinion is counsel's efforts to create the record to allow the decision, and to brief and legally argue the merits. All of this work was done in a timely fashion, and often under significant time constraints. In addition, the work was done in the

midst of a world-wide pandemic.

For me one of the most important factors in reviewing and awarding attorneys' fees is if the attorneys cannot take on other work because of the requirements of the case for which fees are sought.[13] I observed Class Counsels' efforts. I doubt they have been able to work on much else but this case over the past three years. I award the full fee requested.

### 2. Class Representative Bonus

For similar reasons I grant the class representatives' modest request for additional compensation. The class representatives led the class appropriately. They expended many additional hours of effort to achieve the result. Their request is a very small portion of the settlement. To me the small reward is appropriate.

### 3. The Qualified Settlement Fund

Plaintiffs asked me to approve the Qualified Settlement Fund (QSF) consistent with Federal law; including tax law. Creation of the fund is consistent with the best interests of the class, and the administration of the settlement proceeds. I approve it.

---

[13]See Del. Lawyers' R. Prof'l Conduct 1.5 (a)(2).

### 4. The "Gag" Order

This Court entered two orders limiting the parties' ability to publicly discuss the case in the media and elsewhere. The orders were entered for good reasons as stated in companion opinions. I do not believe given the settlement and the current posture of the case the reasons for the orders any longer exist. I am withdrawing the orders.

This opinion is long enough, but one last topic. As I have noted repeatedly, the case was energetically and forcefully litigated. The efforts were almost always civil and in keeping with what I expect and what this Court expects, and in keeping with our finest traditions. The stakes were high. All parties had much at risk. I congratulate all counsel for their efforts to reach this settlement agreement.

I will be signing additional orders necessary to approve the settlement.

**IT IS SO ORDERED**


/s/ Craig A. Karsnitz


cc:     Prothonotary

26